CUMMINS, INC. and Cummins Northwest, Inc., Appellants/Cross–Appellees,

v.

Norval NELSON, Jr., individually and Barbara Cadiente–Nelson, individually; Norval Nelson, Jr. and Barbara Cadiente–Nelson d/b/a F/V Aleut Princess, Appellees/Cross–Appellants.

Nos. S–11172/11201.

Supreme Court of Alaska.

June 24, 2005.

Rehearing Denied Aug. 9, 2005.

Larry G. Berry, Robertson, Monagle & Eastaugh, Anchorage, and James D. Dasso and Therese C. King, Foley & Lardner, Chicago, Illinois, for Appellants/Cross–Appellees.

Michael L. Lessmeier, and Sheldon E. Winters, Lessmeier & Winters, Juneau, for Appellees/Cross–Appellants.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

The Nelsons' fishing boat caught fire, burned, and sank soon after Piston and Rudder Corporation (P & R) renovated it. The renovations, called a "repower," included installation of a Cummins, Inc. marine engine. The Nelsons sued P & R, Cummins, Inc., and Cummins Northwest, Inc. A jury found that P & R acted negligently and that the Cummins defendants cloaked P & R with the authority to act on their behalf by directing the Nelsons to P & R and assuring them that P & R could repower their vessel. The

Cummins defendants appeal. We affirm. We conclude that (1) the evidence adequately supports the jury's negligence and vicarious liability findings; (2) the special verdict form appropriately paraphrased the jury instructions; (3) any potentially erroneous jury instruction that did not influence the negligence or vicarious liability findings was not prejudicial; and (4) any potentially erroneous denial of a directed verdict motion was harmless.

## II. FACTS AND PROCEEDINGS

### A. The Repowering of the ALEUT PRINCESS and the Fire

Norval and Barbara Nelson own and operate a fishing business based out of Juneau.[1] The F/V ALEUT PRINCESS was a seventy-eight-foot wooden boat and one of their two commercial fishing vessels. Cummins, Inc. manufactures marine engines and Cummins Northwest is a distributor for Cummins, Inc.'s products. We refer to Cummins, Inc. and Cummins Northwest collectively as "Cummins" except when context requires specificity.

In July 2000 the ALEUT PRINCESS suffered an engine breakdown in the Lynn Canal area between Haines and Juneau. Norval Nelson chose to replace the main engine with one manufactured by Cummins, Inc. because he had a Cummins engine in his other vessel and liked its performance. He called his wife and asked her to look for a Cummins ad he had seen in a trade magazine. Barbara Nelson gave her husband the Cummins Northwest telephone number she found in an advertisement in *Pacific Fishing*. Norval Nelson testified that he called Cummins Northwest, explained to its representative that he wanted to repower his boat, and was told "I sure can help you out."[2] He testified that the Cummins Northwest representative told him "Petersburg's where you want to go and we can fix you up there." Norval Nelson also testified that he was told by the Cum-

mins Northwest representative that Piston and Rudder, a marine repair shop in Petersburg, "could put in the engine there for [him] and take care of [him] and get [him] back on the road." P & R is an authorized dealer for Cummins Northwest.

Norval Nelson testified that the Cummins Northwest representative gave him the phone number for P & R. He testified that he had never heard of P & R before this conversation, that he called P & R and spoke with Mike Luhr, P & R's owner, about repowering the ALEUT PRINCESS, and that he gave Luhr the boat's specifications. Barbara Nelson testified that Luhr told her that he had the appropriate reduction gear in stock and that the repower could be completed by August 2000.

The Nelsons had the ALEUT PRINCESS towed to P & R in Petersburg. Jason Luhr, Mike Luhr's nephew, testified that P & R removed the old engine and fuel system, installed a 600–horsepower Cummins KTA19 diesel engine, rebuilt the exhaust system, mounted and wired instrument panels, and installed coolant and plumbing. P & R also changed the main and return fuel lines, performed work on the hydraulic system, and installed a new reduction gear. P & R encountered multiple problems during the engine's installation and on subsequent sea trials.

P & R was ready to release the ALEUT PRINCESS to Nelson's son on August 17, 2000. Barbara Nelson testified that her husband did not want the boat to leave P & R's control without a warranty. Norval Nelson testified that he telephoned Cummins Northwest to discuss the warranty. He claimed that he told Cummins Northwest of the problems P & R had during the sea trials and that Cummins Northwest told him that they could not provide a warranty until P & R completed a required installation form. Norval Nelson testified that he told his son to get written confirmation of a warranty from

---

1. The facts outlined below were presented to the jury at trial. We view the facts in a light most favorable to the Nelsons, who prevailed at trial. *Int'l Bhd. of Elec. Workers, Local 1547 v. Alaska Util. Constr., Inc.*, 976 P.2d 852, 853 n. 1 (Alaska 1999).

2. Norval Nelson testified that he called "Cummins Alaska, or something like that" but he referred to a Cummins Northwest advertisement as the source of the telephone number that he dialed.

Luhr. Luhr faxed Barbara Nelson a note stating "Scott Graf from Cummins is going to call Norval and verify warranty start date 8/16/00."

The Nelsons received an invoice for $122,820.01 from P & R for the repower project. Barbara Nelson wrote a check for the full amount to Mike Luhr and P & R.

Nelson's son left Petersburg for Juneau aboard the ALEUT PRINCESS on August 17, 2000. He and other crew members testified that the boat vibrated badly when they ran the new engine at 1400 revolutions per minute. Norval Nelson emailed Cummins about the vibration problem on August 18. Cummins called the Nelsons once but it was early in the morning and Barbara Nelson testified that she asked them to call back. Cummins never called back.

On August 25 the Nelsons took the ALEUT PRINCESS to Angoon. Upon arrival, the boat was docked and the Cummins engine was shut down. Nelson testified that the only power source left running was a Detroit Diesel 271 auxiliary engine.

Around midnight a bystander testified that he saw the ALEUT PRINCESS go "real dim and then [go] bright" twice. He checked on the boat, noticed smoke, and rang the siren. Nelson testified that by the time he arrived on the dock, the ALEUT PRINCESS was filled with smoke. He and his crew did not see flames on the exterior of the vessel or in the galley. The only flames they saw were in an area "above and slightly forward" of the still-running Detroit Diesel engine. One crew member testified that he looked into the engine room and saw flames. Nelson claimed that he was attempting to extinguish the fire when there was an explosion and he was forced to abandon the boat. The fire could not be stopped and the ALEUT PRINCESS had to be cut loose from the dock; it drifted away and eventually sank. Because the boat sank in water too deep for recovery, no physical evidence of the cause of the fire exists.

## B. Proceedings Below

The Nelsons filed a superior court complaint in Juneau against Cummins, Inc., Cummins Northwest, and P & R for (1) breach of contract; (2) breach of express and implied warranties; (3) product liability; and (4) negligence.[3] The case was tried to a jury in Juneau.

Shortly before trial, the Nelsons settled with P & R. P & R was excused from participation at trial and agreed not to put on a defense. In exchange, the Nelsons agreed to pursue recovery on any judgment against Cummins before attempting to collect from P & R. The agreement was introduced as an exhibit at trial.

Two fire investigators testified for the Nelsons. One testified that he had determined that the fire did not originate on the deck, in the wheelhouse, or in any area above deck. They both thought that it was highly probable that the fire was caused by some alteration to the ALEUT PRINCESS during the repower. The only active fuel source was the auxiliary engine, which was situated below a newly relocated "T" in the fuel line. One investigator testified that the fire most likely originated in the area of the "T." But neither investigator could conclusively determine the exact cause of the fire. Both ruled out the Cummins engine itself as a possible source of the fire.

At the close of all evidence, Cummins moved for a directed verdict on all counts and objected to some jury instructions, including one defining "product." It also objected to portions of the special verdict form.

The jury returned a verdict against Cummins, Inc., Cummins Northwest, and P & R on each of the four counts and found that Cummins, Inc. and Cummins Northwest were vicariously liable for the actions of P & R. The jury allocated fault as follows: P & R: sixty-six percent; Cummins, Inc.: fourteen percent; Cummins Northwest: twenty percent; and the Nelsons: zero percent. The jury found that the Nelsons suffered damages totaling $923,509.[4] The superior court

---

3. The Nelsons also asserted a res ipsa loquitor claim that was dismissed on summary judgment.

4. The jury awarded the Nelsons the following damages: (a) value of the ALEUT PRINCESS, $315,000; (b) items of personal property,

denied Cummins's motions for judgment notwithstanding the verdict and for a new trial, and entered final judgment.

On appeal, Cummins contends that (a) the definition of "product" in jury Instruction No. 19 was erroneous and prejudicial; (b) the superior court erroneously refused to grant a directed verdict or new trial on the product liability, direct negligence, direct breach of contract, and direct breach of warranty claims; (c) the superior court erroneously refused to grant a directed verdict or new trial on the vicarious liability claims; and (d) portions of the jury instructions prejudicially conflicted with the special verdict form.[5]

## III. DISCUSSION

### A. Standard of Review

 We review the denial of a directed verdict motion to "determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment as to the facts."[6] We review the superior court's legal rulings de novo, adopting "the rule of law that is most persuasive in light of precedent, policy, and reason."[7] We review jury instructions de novo when a timely objection is made.[8] Without a timely objection, we will only review instructions for plain error.[9] A special verdict form is a type of jury instruction subject to the same standard of review.[10]

### B. The Jury's Finding that Cummins Was Vicariously Liable for P & R's Negligence Was Supported by the Evidence.

Cummins argues that it should have been granted a directed verdict on the vicarious liability claim because the trial evidence was so weak that, as a matter of law, it could not justify a finding of apparent authority. Cummins contends that Nelson presented no evidence showing that "*Cummins* did anything that *the Nelsons reasonably relied upon*" to believe that P & R had any relationship beyond a "traditional manufacturer/distributor/dealer relationship" with Cummins. (Emphasis in original.)

The superior court concluded that "reasonable jurors could find for the Nelsons" and denied Cummins's directed verdict motion. The jury found that P & R was negligent and that P & R's negligence was a legal cause of the fire. Cummins has not appealed this finding. The jury also found Cummins vicariously liable for P & R's negligence based on apparent authority.[11]

 Apparent authority is used to hold a principal accountable for a third party's belief about an actor's authority to act as an agent for the principal when the belief is reasonable and is traceable to a manifestation of the principal.[12] Apparent authority is

$20,260; (c) past lost income, $64,249; (d) future lost income, $24,000; (e) personal injury, $200,000; (f) emotional distress (Norval Nelson), $200,000; and (g) emotional distress (Barbara Nelson), $100,000.

5. The Nelsons' cross-appeal argues that the superior court erroneously limited damages to fair market value of the ALEUT PRINCESS. It also argues that the superior court erroneously refused to instruct the jury on punitive damages. They condition their cross-appeal on a reversal for a new trial in Cummins's appeal. Because we affirm, we need not address the cross-appeal arguments.

6. *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 722 (Alaska 2003).

7. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

8. *Reich v. Cominco Alaska, Inc.*, 56 P.3d 18, 25 (Alaska 2002).

9. *Manes v. Coats*, 941 P.2d 120, 125 (Alaska 1997).

10. *Glamann v. Kirk*, 29 P.3d 255, 259 (Alaska 2001).

11. Special verdict Question Nos. 10(a) and 10(b) addressed the issue of apparent authority. Question No. 10(a) asked: "Did the plaintiffs have reason to believe that Piston and Rudder was an agent of Cummins Northwest?" Question No. 10(b) asked: "Did the plaintiffs have reason to believe that Piston and Rudder was an agent of Cummins Engine?" The jury answered "Yes" to both questions.

12. RESTATEMENT (SECOND) OF AGENCY § 8 (1958). Section 8 states "[a]pparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons."

created "by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."[13] There are three considerations in evaluating apparent agency: (1) the manifestations of the principal to the third party; (2) reliance on the principal's manifestations by the third party; and (3) the reasonableness of the third party's interpretation of the principal's manifestations and the reasonableness of the third party's reliance.[14] If a principal cloaks its apparent agent with authority to enter into a transaction on its behalf, the principal is liable as if it had entered into the transaction personally.[15]

### 1. Cummins's manifestations to Nelson

A manifestation may be in the form of "written or spoken words or any other conduct...."[16] The manifestation may be directly communicated to the third party or may come through signs, advertising, authorization of an agent to claim that he is authorized, or continuous employment of the agent.[17]

Nelson testified that, after his wife gave him the phone number from an advertisement, he called Cummins Northwest in Anchorage, explained which engine he wanted to purchase, and asked if they could help him out.[18] According to Nelson, Cummins Northwest's employee responded: "Yeah, I

sure can help you out.... Petersburg's where you want to go and we can fix you up there."

Nelson testified that the Cummins Northwest employee gave him P & R's phone number and told him that P & R "could put in the engine there for [him] and take care of [him] and get [him] back on the road." Nelson then called P & R and negotiated the repower with Mike Luhr. There was no evidence that Nelson had further contact with Cummins, Inc. or Cummins Northwest until after the repower was complete.

Cummins correctly argues that in this case our review of the evidence should focus on Cummins's manifestations that Nelson was aware of. In a case in which there was no communication between the principal and the third party, we overturned a finding of apparent authority.[19] But in this case, Nelson testified that he spoke with an employee of Cummins Northwest and that the employee referred him to P & R, telling him that "we can fix you up there." The evidence of Cummins's manifestations to Nelson was sufficient to present a jury question concerning this element of the Nelson's apparent authority claim.[20]

### 2. Nelson's reliance on Cummins's manifestations

The commentary to the Restatement (Second) of Agency states "[t]he mere fact that acts are done by one whom the injured party believes to be the defendant's servant is not

---

**13.** *City of Delta Junction v. Mack Trucks Inc.*, 670 P.2d 1128, 1130 (Alaska 1983) (adopting the Restatement (Second) of Agency's general rule for creation of apparent authority).

**14.** Restatement (Second) of Agency § 8 (1958).

**15.** Restatement (Second) of Agency § 140, cmt. a (1958).

**16.** Restatement (Second) of Agency § 27 (1958).

**17.** Restatement (Second) of Agency § 8, cmt. b (1958).

**18.** For more detailed discussion of the proceedings and evidence, see Part II above.

**19.** *Bruton v. Automatic Welding & Supply Corp.*, 513 P.2d 1122, 1126 (Alaska 1973) (holding that trial court clearly erred in finding agency rela-

tionship when principal never indicated to third party that supposed agent had authority). *See also Perkins v. Willacy*, 431 P.2d 141, 143 (Alaska 1967) (holding it was clear error for trial court to find apparent agency when third party never spoke with principal about transaction at issue).

**20.** *See, e.g., Fleming Co. v. NLRB*, 349 F.3d 968, 973 (7th Cir.2003) (sustaining board's conclusion that management cloaked employee with authority in part by introducing employee as supervisor and referring to employee as team leader); *Anchor Crane & Hoist Serv. Co. v. Sumrall Pers. Serv., Inc.*, 620 S.W.2d 653, 654 (Tex.Civ.App. 1981) (affirming jury's finding that company president cloaked employee with hiring power because president transferred call from recruiter directly to employee).

sufficient to cause the apparent master to be liable. There must be such reliance upon the manifestation as exposes the plaintiff to the negligent conduct." [21]

█ The evidence was sufficient to allow the jury to determine whether Nelson relied on Cummins's manifestations in choosing to have his new engine installed by P & R.[22] Nelson testified that he decided to have a Cummins engine installed in the ALEUT PRINCESS because he liked the performance of the Cummins engine in his other vessel. Nelson had his wife retrieve the Cummins Northwest advertisement, called Cummins Northwest, and was referred by Cummins Northwest to P & R. Nelson testified that he had never heard of P & R before this conversation. If he had known that P & R was not part of Cummins, Nelson testified he would not have had his engine installed there because it is "too small of an operation. I've got to work with people that I know will back me if something goes wrong, be able to get me ... fixed up, get me back out on the grounds, like they said they would." Nelson testified that he chose Cummins "[b]ecause they're a big company and they stand by ... their word."

Reasonable persons could permissibly find from the evidence that Nelson believed he was dealing with Cummins during the entire repower transaction. His initial contact was with Cummins Northwest. When the installation was complete and Nelson was looking for a warranty for the work done on the ALEUT PRINCESS, he called Cummins Northwest directly. After the ALEUT PRINCESS was released by P & R, Nelson sent an email directly to Cummins asking for help with the vibration problem. The evidence of Nelson's reliance on Cummins's manifestations was sufficient to present a jury question on this element of apparent authority.

### 3. Reasonableness of Nelson's belief that P & R was acting for Cummins and reasonableness of his reliance on Cummins's manifestations

Per the commentary to Restatement (Second) of Agency § 8, "[a]pparent authority exists only to the extent that it is reasonable for the third party dealing with the agent to believe that the agent is authorized." [23]

█ Nelson testified that he believed that he was dealing with Cummins during the entire installation. Cummins argues that Nelson should have known that P & R was not an agent of Cummins because P & R is an authorized dealer for manufacturers other than Cummins. But we must consider Cummins's manifestations to Nelson in light of what Nelson knew or should have known at the time of the manifestations.[24] Nelson testified that he did not know that P & R was a dealer for other manufacturers or distributors. He testified that he had never done business with P & R before the repower. Cummins argues that, because P & R displayed brochures from other manufacturers in its shop and was listed as an authorized dealer for other manufacturers in the Marine Yellow Pages, Nelson should have been alerted to the fact that P & R was not Cummins's agent. But Norval Nelson testified that he negotiated the engine installation with Mike Luhr over the telephone and that he never personally visited P & R's shop during the installation. At trial, Cummins questioned Norval Nelson about the reasonableness of his belief that he was dealing with Cummins through P & R because Cummins's name was not listed on P & R's letterhead and there was no mention of Cummins in the bill. But Nelson testified that he did not receive any written documentation from P & R until after the repower was nearly complete.

21. RESTATEMENT (SECOND) OF AGENCY § 267, cmt. a (1958).

22. *City of Delta Junction v. Mack Trucks Inc.*, 670 P.2d 1128, 1131 (Alaska 1983) (holding it was jury question whether Mack Truck's acquiescence to Alaska Mack's use of its name and reputation was sufficient for apparent agency). *See also Mercer v. Weyerhaeuser Co.*, 324 N.J.Super. 290, 735 A.2d 576, 594 (1999) (holding plaintiffs' assertions that principal's reputation influenced their decision created issue of fact for jury).

23. RESTATEMENT (SECOND) OF AGENCY § 8, cmt. c (1958).

24. *See* RESTATEMENT (SECOND) OF AGENCY § 49(a) (1958).

There was also evidence that tended to show Nelson's belief was unreasonable. When Nelson telephoned P & R, no one that Nelson spoke to represented themselves as an employee of Cummins and the telephone was answered as "Piston & Rudder." Nelson testified that he understood the difference between an appliance manufacturer and a dealer but that he did not think that the same manufacturer-dealer relationship existed in the automobile industry.

Cummins's main argument on appeal is that the "manufacturer/ distributor/dealer relationship" does not give rise to apparent authority. But the evidence reasonably permitted a finding that Nelson did not rely simply on P & R's status as an authorized dealer when he chose to have his vessel repowered by P & R. Norval Nelson testified that a Cummins Northwest employee told him that "we can fix you up" in Petersburg.

 It is usually for the trier of fact to decide whether a reasonable person in the position of the third party would believe that the agent had the authority or the right to do a particular act.[25] "The jury brings broad practical experience to bear on the evidence, and motions for directed verdict should be scrutinized under a principle of minimum intrusion into the right to jury trial...."[26] Viewed in the light most favorable to the prevailing parties at trial, there was adequate evidence supporting Norval Nelson's belief that P & R was acting on behalf of Cummins to allow the jury to consider the reasonableness element of the Nelsons' apparent authority claim.

### 4. Submission of apparent authority to the jury

As we saw above, there was sufficient evidence supporting each element of the Nelsons' apparent authority claim to allow the jury to determine whether Cummins cloaked P & R with authority to act on its behalf. The superior court did not err by refusing to grant Cummins's directed verdict motion. Because the jury permissibly found that P & R had apparent authority to act for Cummins Northwest and Cummins, Inc., both defendants are liable for the negligence of P & R as if they were personally negligent.[27]

### C. The Special Verdict Form Appropriately Paraphrased the Jury Instructions.

 Cummins argues that "the special verdict form invited the jury to stray from the elements of apparent agency." In essence, Cummins argues that, even though Instruction No. 38 correctly required the jury to find both a manifestation by Cummins and reasonable reliance on that manifestation by Nelson, the special verdict form only asked the jury whether Nelson had "reason to believe" that P & R was acting for Cummins.

 Alaska Civil Rule 49(b) allows the superior court to submit to the jury "written questions susceptible of categorical or other brief answer...." We treat a special verdict form as a type of jury instruction subject to the same standard of review applicable to claims of instructional error.[28] To be reversibly erroneous, an instruction must contain an erroneous statement of the law and the error must be prejudicial.[29]

Instruction No. 38 read in part:

---

**25.** *Mack Trucks*, 670 P.2d at 1130.

**26.** *Id.* at 1130 n. 2 (internal citations omitted).

**27.** *See Austin v. Fulton Ins. Co.*, 498 P.2d 702, 705 (Alaska 1972) (noting that principal is liable for tort committed by agent within scope of apparent authority); *see also* RESTATEMENT (SECOND) OF AGENCY § 8, cmt. a (noting that if apparent authority exists, third party has same rights with reference to principal as when agent is authorized); RESTATEMENT (SECOND) OF AGENCY § 215 (1958) (stating principal is liable to third party for torts committed by authorized agent).

**28.** If no timely objection is made to an instruction, we will review the instruction only for plain error. *See supra* note 9. Cummins asserted a general objection to the special verdict form as being potentially confusing but did not specifically object to Question Nos. 10(a) or 10(b). It is doubtful that this was an adequate objection, but the applicable standard of review is irrelevant because we conclude that Question Nos. 10(a) and 10(b) were not incorrect.

**29.** *Grimes v. Haslett*, 641 P.2d 813, 818 (Alaska 1982).

The law makes Cummins Northwest or Cummins Engine responsible for the acts of Piston and Rudder if you decide it is more likely than not true that:

(1) Cummins Northwest or Cummins Engine did or said something that caused the plaintiff reasonably to believe that Piston and Rudder was authorized to act on behalf of Cummins Northwest or Cummins Engine; and

(2) The plaintiff reasonably relied on this belief.

Question No. 10(a) of the special verdict form asked: "Did the plaintiffs have reason to believe that Piston and Rudder was an agent of Cummins Northwest?" Question No. 10(b) asked: "Did the plaintiffs have reason to believe that Piston and Rudder was an agent of Cummins Engine?"

■■■■ A special verdict form question need not lay out all of the elements in a cause of action.[30] A special verdict form question is intended to be simple and concise, not repetitive or misleading.[31] Indeed, if the special verdict form could not paraphrase the instructions to some extent, the special verdict form would be as long as the relevant instructions themselves, and would have to repeat them verbatim. We assume that a jury follows the trial court's instructions,[32] and we consider this special verdict form in the context in which it was given.[33] Instruction No. 38 required the jury to find both a manifestation by Cummins and reasonable reliance on that manifestation by Nelson. It instructed the jury that if both requirements were not fulfilled, Cummins was not respon-

sible for the actions of P & R.[34] Questions No. 10(a) and 10(b) appropriately paraphrased the jury instruction and were therefore not erroneous.

## D. Jury Instruction No. 19 Did Not Influence the Findings of Negligence or Apparent Authority and Was Not Prejudicial.

■■ Cummins argues that Instruction No. 19 erroneously instructed the jury on the definition of "product." Cummins claims that it was "severely prejudiced" because the jury found Cummins strictly liable for the fire even though Nelson presented no evidence that the Cummins engine was defective or that it caused the fire.

Instruction No. 19 read:

In considering plaintiffs' separate theories of recovery, you are instructed that the "product" at issue is a marine engine, model KTA 19–M3, manufactured by Cummins, Inc. As used in these instructions, the term "product" includes the installation of all those things necessary for the installation of the engine.

■■■ To remand for an incorrect jury instruction, we must conclude both that the instruction incorrectly states the law and that it was prejudicial.[35] "An erroneous instruction is prejudicial if it can be said that the verdict may have been different had the erroneous instruction not been given."[36]

We conclude that Instruction No. 19 was not prejudicial.[37] Instruction No. 15 made it

**30.** *See Simmons v. Garces,* 198 Ill.2d 541, 261 Ill.Dec. 471, 763 N.E.2d 720, 735 (2002); *Seattle W. Indus., Inc. v. David A. Mowat Co.,* 110 Wash.2d 1, 750 P.2d 245, 251 (1988).

**31.** *Simmons,* 261 Ill.Dec. 471, 763 N.E.2d at 735. *See also Smith v. Sturm, Ruger & Co.,* 39 Wash.App. 740, 695 P.2d 600, 604 (1984) ("[A]n instruction which does not purport to summarize all the issues is not held to the same standard as a formula instruction.").

**32.** *Central Bering Sea Fishermen's Ass'n v. Anderson,* 54 P.3d 271, 281 (Alaska 2002).

**33.** *See Simmons,* 261 Ill.Dec. 471, 763 N.E.2d at 735.

**34.** Instruction No. 38 as it appears in the record contains a double negative. The superior court

deleted one of the negative terms when it read the instruction to the jury. No party claims that the jury was misled by Instruction No. 38.

**35.** *General Motors Corp. v. Farnsworth,* 965 P.2d 1209, 1214 (Alaska 1998).

**36.** *Beck v. State, Dep't of Transp. & Pub. Facilities,* 837 P.2d 105, 114 (Alaska 1992).

**37.** The majority of Cummins's argument contends that Instruction No. 19 was an incorrect statement of Alaska law. Because we determine that any error was not prejudicial, we do not address the threshold question of whether the substance of Instruction No. 19 was a correct statement of the law.

clear that the jury was being instructed on the Nelsons' four alternate theories of liability: product liability, negligence, breach of contract, and breach of warranty.

Instruction No. 17 began: "Plaintiffs' first theory of recovery is that Plaintiffs were damaged by a defect in a product which the Defendant made or sold;" it then described the elements of a product liability claim. Instructions No. 18, 19, and 20 defined words and phrases used in Instruction No. 17. Instructions No. 21, 22, and 23 related to the burden of proof and how it could be met, and comparative negligence.

Instruction No. 24 began: "[t]he plaintiffs' second claim is that they were harmed because of the negligence of the defendants . . . ;" it then described the elements of a negligence claim. The word "product" did not appear in this instruction or in the next five instructions that related to the negligence claim.

Reading the instructions as a whole, it is apparent that the jury was instructed separately on each of the plaintiffs' four liability theories. For example, Instructions No. 20 and No. 28 separately define "legal cause" for the product liability claim and the negligence claim, respectively. Instruction No. 20 provided that "[a] defective condition in a product is a legal cause of harm if it is a substantial factor in bring[ing] about the harm." Instruction No. 28 defined legal cause as "an act or failure to act which is a substantial factor in bring[ing] about the harm." This demonstrates that the jury was told to consider Instruction No. 19's definition of product when it was determining liability under the product liability claim, but not when it was considering the negligence claim. The jury found liability on the negligence claim. The jury's negligence finding was not dependent on the definition of product in Instruction No. 19.

Nor would Instruction No. 19 have influenced the jury's consideration of the vicarious liability claim. Instruction No. 38 explained the elements of apparent agency. The word "product" did not appear in this instruction, and the instruction did not refer

the jury back to the product liability instructions.

Cummins alternatively argues that we should remand for a new trial because the definition of "product" took the issue of vicarious liability away from the jury by permitting it to hold Cummins responsible for the "installation of all those things necessary for the installation of the engine." [38] Cummins contends that the jury might have found differently on the vicarious liability claim had this instruction had not been given. This argument is unpersuasive because the jury instructions clearly dealt separately with the four claims.

The Nelsons' counsel did not argue to the jury that Instruction No. 19 required the jury to find vicarious liability. He relied on the definition of "product" in Instruction No. 19 to argue that Cummins had warranted the entire repower project. When explaining the evidence that supported the apparent authority claim, he did not refer to Instruction No. 19. He argued that Cummins cloaked P & R with apparent authority through its advertisements and direct manifestations to the Nelsons.

We conclude that the record contains adequate evidence to support the jury's findings that P & R was negligent and that Cummins was vicariously liable for P & R's actions. The jury instructions and special verdict questions that related to negligence and apparent agency were not erroneous and we affirm the verdict and damage award on these legal bases. Any potentially erroneous jury instruction unrelated to the claims of vicarious liability or negligence is therefore not prejudicial.

### D. The Superior Court's Refusal To Direct a Verdict on the Direct Liability Claims Was Harmless Error.

Cummins argues that the superior court erred by refusing to direct a verdict for Cummins on the product liability, direct negligence, breach of contract, and breach of warranty claims. Even assuming error, the failure to grant a directed verdict on the direct (non-vicarious) liability claims was

---

**38.** *See supra* pp. 545–546.

harmless. If a jury returns separate verdicts on independent claims, we can affirm the judgment if substantial evidence supports any of those claims.[39] Substantial evidence here supported the jury's findings that P & R was negligent and that Cummins, Inc. and Cummins Northwest were vicariously liable for P & R's negligence. There is consequently no need to address the merits of Cummins's directed verdict motions on the direct liability claims.

## IV. CONCLUSION

For these reasons, we AFFIRM the judgment.

---

**39.** *See Del Monte Dunes at Monterey, Ltd. v. City of Monterey,* 95 F.3d 1422, 1426 (9th Cir.1996), *reh'g granted by* 118 F.3d 660 (9th Cir.1997), *aff'd by* 526 U.S. 687, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (holding that, where jury was instructed separately on two claims and found defendant liable on both, verdict could be affirmed if substantial evidence supported either claim).