NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| PATRICK W. RUSSELL, | ) | |
| | ) | Supreme Court No. S-16040 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-12-06581 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| MUNICIPALITY OF ANCHORAGE, | ) | AND JUDGMENT[*] |
| ANIMAL CARE AND CONTROL, | ) | |
| | ) | No. 1622 – March 29, 2017 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Patrick W. Russell, pro se, Chugiak, Appellant. Pamela D. Weiss, Assistant Municipal Attorney, and William D. Falsey, Municipal Attorney, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices. Stowers, Chief Justice, concurring.

An animal control officer of the Municipality of Anchorage classified Patrick Russell's dog at level five after concluding that the dog caused serious physical injury when he bit an 11-year-old boy in the leg on Russell's property.[1] Animals

---

[*]  Entered under Alaska Appellate Rule 214.

[1]  *See* Anchorage Municipal Code (AMC) 17.40.020(A)(5)(a) (2016).

classified at level five must be euthanized.[2] But the municipal code provides an exception to this classification "if the chief animal control officer determines that . . . [a]t the time of injury . . . the victim was committing trespass . . . on premises occupied by the owner . . . of the animal."[3]

Trespass is "an unauthorized intrusion or invasion of another's land."[4] As long as the person intentionally enters the land, a person may be liable for trespass even if the person "honestly and reasonably believes" that he or she is allowed to be on the land.[5] Minors may be held liable for trespass.[6]

A person is not liable for trespass if he or she is given consent to be on the land.[7] But if that consent is limited to only part of the land, the person is liable for trespass if he or she enters land outside of the permitted area.[8] Consent may be granted by either the possessor of the land (for instance, the person renting the land) or a third party acting with the possessor's authority.[9] Consent exists if the land possessor has

---

[2] AMC 17.40.040(B)(4).

[3] AMC 17.40.020(B)(1).

[4] *St. Paul Church v. United Methodist Church*, 145 P.3d 541, 558 (Alaska 2006).

[5] RESTATEMENT (SECOND) OF TORTS § 164 cmt. a.

[6] *See id.* § 895I reporter's note (compiling cases).

[7] *See Lee v. Konrad*, 337 P.3d 510, 522 (Alaska 2014).

[8] RESTATEMENT (SECOND) OF TORTS §§ 168, 169 cmt. b; *see also Matanuska Elec. Ass'n, Inc. v. Weissler*, 723 P.2d 600, 605 (Alaska 1986).

[9] RESTATEMENT (SECOND) OF TORTS § 158 cmt. c; *see id.* § 892A(2). A third party may have express, implied, or apparent authority to act on behalf of the land possessor. *See* RESTATEMENT (SECOND) OF AGENCY § 7 cmt. c. Express authority exists
(continued...)

*actually* consented.[10] Consent also exists if the land possessor has *apparently* consented; the test for apparent consent is both objective and subjective. Thus, apparent consent exists if the land possessor's "words or conduct are reasonably understood by another to be intended as consent."[11] And as with trespass, a person might not have consent even if the person "honestly so believes" that consent was given — that is, an entirely subjective state of mind is not enough to create consent; the objective component is also needed.[12]

The letter from the animal control officer, which classified the dog at level five, does not discuss whether the victim was committing trespass at the time of the injury. And although trespass was discussed, Russell did not press the issue during the hearing on the classification held before a municipal hearing officer. But Russell did

---

[9] (...continued)
if the possessor gives specific instructions to the third party. *See id.* Implied authority exists if the possessor gives general instructions to the third party and the third party's authority is "implied or inferred from the words used, from customs and from the relations of the parties." *Id.* Apparent authority exists if the possessor indicates to the alleged trespasser that the third party is authorized to act on the possessor's behalf, even though the third party does not have express or implied authority. *See id.* § 8. For the rest of this paragraph, "land possessor" is used as shorthand for "land possessor or a third party acting with the possessor's authority."

[10] RESTATEMENT (SECOND) OF TORTS § 892.

[11] *Id.* We have also stated that consent can be "implied from actions or conduct, applicable social conventions, or the relationship between the parties." *Lee*, 337 P.3d at 522.

[12] *See* RESTATEMENT (SECOND) OF TORTS § 892 cmt. c.

raise the trespass exception when he appealed the classification to the then-existing Animal Control Appeals Board.[13]

The board determined that the victim was not committing trespass at the time of the injury. The superior court initially reversed the board, but eventually reached the same conclusion after reviewing the administrative record de novo. Russell now appeals the superior court's decision, again arguing that the victim was committing trespass at the time of the injury.

"[A] court may, in appropriate cases, stay or dismiss pending litigation so as to enable a proper agency to initially pass upon an aspect of the case calling for administrative expertise."[14] Such circumstances may arise "if the case requires the exercise of administrative discretion."[15] This rule promotes the " 'reasonable coordination of the work of agencies and courts,' which is generally best achieved when courts decline to rule 'on a subject peculiarly within the agency's specialized field without first taking into account what the agency has to offer.' "[16]

As noted above, the determination whether a victim was committing trespass is initially the decision of the chief animal control officer. More importantly, even if the officer concludes that a victim was committing trespass, the decision whether to "refrain from classifying an animal" is also subject to the officer's "discretionary

---

[13]    *See* former AMC 17.05.105(A)(2)(a) (2015).

[14]    *Seybert v. Alsworth*, 367 P.3d 32, 39 (Alaska 2016).

[15]    *Id*.

[16]    *Id*. (quoting *G & A Contractors, Inc. v. Alaska Greenhouses, Inc.*, 517 P.2d 1379, 1383 (Alaska 1974)).

authority."[17]  Thus, even if a court decides that a victim was committing trespass at the time of an injury, the animal control officer retains the authority to maintain the classification that would otherwise apply.  We therefore conclude that we should remand this matter to the officer who has the primary authority to make this decision.

We therefore VACATE the superior court's decision and REMAND this matter to the chief animal control officer for the Municipality of Anchorage to determine whether to refrain from classifying Russell's dog at level five.

We do not retain jurisdiction.

---

[17]      AMC 17.40.020(B).

STOWERS, Chief Justice, concurring.

I agree that the superior court's decision was erroneous and must be vacated, and that the matter must be remanded to the Municipality of Anchorage's chief animal control officer for further evaluation and consideration. I write separately to highlight what I believe the critical questions are that the officer must answer to make a proper and informed decision, and to create a complete record in case this matter returns to the court on further appeal.

I believe that the most important questions presented by this case are: (1) did Gator the Dog's owner, Megan Russell (who is also Alex's mother), instruct Jeffrey Williams, Alex's friend and next door neighbor, to stay out of the backyard or not go into the dog kennel in the back yard when he came over to the Russells' property to play with Alex?; (2) if Megan did instruct Jeffrey to stay out of the back yard or dog kennel, did she subsequently change her mind and give Jeffrey permission to enter the dog kennel?; (3) did Alex, without authority from his mother, tell Jeffrey she consented to Jeffrey entering the dog kennel?; and (4) if Alex gave Jeffrey his consent to enter the dog kennel, did Alex have legal authority to do so in the face of his mother's instruction that Jeffrey not go into the dog kennel?

Animal Control Officer Perry Smith interviewed 11-year-old Jeffrey the day after Jeffrey entered the dog kennel and was bitten in the calf by Gator. According to Officer Smith's report, Jeffrey said that Alex told him to go into the kennel. Officer Smith received a written statement by Alex that contradicted Jeffrey; Alex said he told Jeffrey to wait outside the kennel but Jeffrey failed to do so. Officer Smith observed that there were "NO TRESPASSING" and "BEWARE OF DOG" signs on the kennel. Officer Smith wrote in his report and testified at an administrative hearing three months later that he confirmed that Jeffrey "was able to tell [him] what no trespassing meant."

Jeffrey also testified at the hearing and his version of events changed as he answered questions. In his direct testimony he stated that Alex had asked his mother whether he could go into the kennel to fill his squirt gun and Alex's mother said yes. However, during cross-examination by Megan, Alex agreed that Megan "set forth very clear rules to not go into the house, to stay out of the dog kennel, to not throw rocks, to be nice to the small kids, because these had all been problems in the past."

Megan testified that she "designated a play area . . . in the front of the house" where there is "a very long driveway" and "Jeffrey agreed to those terms." Megan's mother, Yvonne Meili, was present during this conversation and corroborated Megan's testimony, stating that "Megan did . . . tell them both . . . that [Jeffrey] wasn't allowed in the house or the backyard."

On appeal to the superior court, the court found that although Jeffrey was not initially permitted to enter the house or dog kennel, he did not commit trespass because "Jeffery understood that the scope [of consent] had been modified to include the [dog kennel] enclosure."

In my opinion the superior court committed legal error because it based its decision that Jeffrey had not trespassed on Jeffrey's *subjective* belief that the scope of Megan's consent had been expanded to permit Jeffrey to enter the dog kennel. The correct standard in deciding whether a person has trespassed or has obtained consent to enter the property of another is an *objective* standard. We have followed the Restatement (Second) of Torts in articulating an objective standard for trespass. "Trespass is defined as an unauthorized intrusion or invasion of another's land. An intentional entry onto the land of another constitutes intentional trespass even if the trespasser believes that he has

the right to be on the land."[1]  According to the Restatement, one is subject to trespass liability even if "he acts under a mistaken belief of law or fact, . . . not induced by the conduct of the possessor, that he . . . has the consent of the possessor or of a third person who has the power to give consent on the possessor's behalf."[2]  However, there is no liability for trespass if the land possessor consents to the alleged trespasser's presence on her land.[3]  When the land possessor has restricted her consent to only part of the land, the would-be trespasser is liable for trespass if he enters land outside of the permitted area.[4]  Minors may be held liable for trespass.[5]

---

[1]    *St. Paul Church v. United Methodist Church*, 145 P.3d 541, 558 (Alaska 2006) (first citing *Mapco Express, Inc. v. Faulk*, 24 P.3d 531, 539 (Alaska 2001) (citing, *inter alia*, RESTATEMENT (SECOND) OF TORTS §§ 158, 163 (AM. LAW INST. 1965)); then citing *Brown Jug, Inc. v. Int'l Bhd. of Teamsters*, 688 P.2d 932, 938 (Alaska 1984) (citing RESTATEMENT (SECOND) OF TORTS § 164)).

[2]    RESTATEMENT (SECOND) OF TORTS § 164(b).  The Restatement provides a helpful illustration: "A, through his son B, asks C's permission to cross C's field. C refuses permission, but B reports that C has consented.  A enters C's field.  A is subject to liability to C."  RESTATEMENT (SECOND) OF TORTS § 164 cmt. d., illus. 5.  Of course, in the case at bar, B is C's son, not A's, and one could argue that a hypothetical C's son could be acting as C's agent.  However, even if A "reasonably but mistakenly believ[ed]" that B was C's agent, A would still be liable for trespass even though he entered C's land pursuant to a contract with the false agent B. RESTATEMENT (SECOND) OF TORTS § 164 cmt. d., illus. 8.

[3]    *Lee v. Konrad*, 337 P.3d 510, 522 (Alaska 2014).

[4]    RESTATEMENT (SECOND) OF TORTS § 169 cmt. b. *See also Matanuska Elec. Ass'n, Inc. v. Weissler*, 723 P.2d 600, 605 (Alaska 1986) (concluding that the defendant electrical association committed trespass because it exceeded the scope of consent when it cleared trees beyond a four foot easement).

[5]    *See* Reporter's Note to RESTATEMENT (SECOND) OF TORTS § 895I (compiling cases).

Consent is "willingness in fact for conduct to occur."[6] Consent can be actual or apparent.[7] As this court recently stated in *Lee v. Konrad*, a land possessor's consent can be "implied from actions or conduct, applicable social conventions, or the relationship between the parties."[8] "If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact."[9] The Restatement makes clear that an "apparent consent" analysis is based on the objective conduct of the person giving consent, not the subjective belief of the other party:

> Even when the person concerned does not in fact agree to the conduct of the other, his words or acts or even his inaction may manifest a consent that will justify the other in acting in reliance upon them. This is true when the words or acts or silence and inaction, would be understood by a reasonable person as intended to indicate consent and they are in fact so understood by the other. . . . On the other hand, if a reasonable person would not understand from the words or conduct that consent is given, the other is not justified in acting upon the assumption that consent is given *even though he honestly so believes;* and there is then no apparent consent.[10]

It will be up to the Animal Control Officer to determine what the true facts are when he re-evaluates the evidence, and of course he has the discretion to conduct

---

**6**      RESTATEMENT (SECOND) OF TORTS § 892(1).

**7**      *See id.*

**8**      *Lee*, 337 P.3d at 522 (citing 1 DAN B. DOBBS, PAUL T. HAYDEN & ELLEN M. BUBLICK, THE LAW OF TORTS § 105, at 318 (2d ed. 2011).

**9**      *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 892).

**10**      RESTATEMENT (SECOND) OF TORTS § 892 cmt. c (emphasis added).

further investigation. But based on the evidence and testimony recited above, it appears that Megan gave her consent that Jeffrey could play with Alex in the front yard, but she prohibited him from coming into the back yard where the dog kennel was located, and she explicitly told him not to enter the dog kennel. Megan's prohibition was reinforced by the sign on the kennel: "NO TRESPASSING" and "BEWARE OF DOG." Jeffrey told the animal control officer that he knew what "no trespassing" meant and he agreed in his testimony that Megan "set forth very clear rules . . . to stay out of the dog kennel." Assuming this evidence and testimony are true, Megan did not consent to Jeffrey going into the kennel, and his entry into the kennel was trespass.

Jeffrey claimed that Alex subsequently asked his mother if Jeffrey could go into the kennel and Alex said Megan said Jeffrey could do so. According to the superior court's ruling, Megan "firmly maintain[ed] that she never gave Jeffrey permission to enter the enclosure." But if it is true that Megan did change her mind and consented to Jeffrey entering the kennel, then Jeffrey did not trespass when he entered the kennel.

What if Alex did not really ask his mother if Jeffrey could go into the kennel, or what if Alex did ask his mother and she said "no," but Alex nevertheless told Jeffrey he could go into the kennel? This is where principles of agency law come into play.[11]

In the context of this case, the parents and owners of the property (and the dog) possess legal authority to decide who may or may not come onto the premisses (or into the dog kennel). It is potentially possible that the parents could delegate their authority to make these decisions to their child. In such a case, the parents are the

---

[11] Another possibility is that Jeffrey was lying when he said that Alex said that Megan consented to his going into the kennel. If this is the true fact, then Jeffrey trespassed when he entered the kennel.

principals and the child is their agent.  Under the law of agency, an agent has a duty to exercise only that authority that the principal delegates to the agent.  The agent has no authority to act in a manner that is directly contrary to the authority (and the limits on that  authority) that the principal grants to the agent.

If a principal communicates the terms and limitations to a third party on where a third party can use the principal's property and where the third party is prohibited from going on the property, then the third party is charged with knowledge of the permissive and prohibitive terms.  Moreover, if the agent is also present when the principal sets forth what is permitted and what is prohibited, the third party is charged with knowledge that the agent has no authority to expand the principal's scope of permission (or to relax or nullify the principal's prohibition), unless the principal herself has by word or deed communicated to the third person that her agent has authority to modify the terms previously established by the principal.

So if in this case Megan (the property owner and mother of Alex) expressly stated to Jeffrey (the third party) and Alex (the purported agent) that they were to play in the front yard and not to go into the back yard and not to enter the dog kennel, then Jeffrey is charged with knowing that (1) he was not to enter the back yard and kennel and (2) Alex had no authority to modify his mother's commands.  If Alex later said that Jeffrey could enter the kennel, the legal question becomes whether Alex had apparent authority to make or communicate this change from Megan's original instructions.

"We have adopted the Restatement's general rule for creation of apparent authority."[12]  "Apparent authority to do an act is created as to a third person when a principal's conduct, reasonably interpreted, 'causes the third person to believe that the

---

[12]      *Airline Support v. ASM Capital II, L.P.*, 279 P.3d 599, 604 (Alaska 2012) (citation omitted).

principal consents to have the act done on his behalf by the person purporting to act for him.' "[13]

Apparent authority is used in law to hold a principal accountable for a third party's belief about an actor's authority to act as an agent for the principal, but only when the third party's belief is reasonable and is traceable to a manifestation of the principal.[14] Also, "[a]gents often attempt to create the appearance of authority by their own acts or statements, but such an appearance does not create apparent authority; the principal is only liable for the appearance of authority caused by the principal's own conduct."[15]

In other words, Alex could not on his own create his authority to give permission to Jeffrey to enter the dog kennel, nor could Jeffrey rely on Alex's statement that his mother had given permission for Jeffrey to enter the kennel; for Alex to have apparent authority to give permission, Megan would have had to have said or communicated something *to Jeffrey* that would reasonably lead Jeffrey to believe that she had authorized Alex to make the decision on her behalf. If there is no evidence that Megan communicated anything to Jeffrey that would lead him to reasonably believe that she had authorized Alex to decide on her behalf that Jeffrey could enter the kennel, then Alex could have no apparent authority to give Jeffrey permission to enter the dog kennel; and when he did so he was trespassing (for two separate reasons: (1) the sign on the kennel stated "NO TRESPASSING" and Jeffrey admitted he knew what that meant, and

---

[13]     *Id*. at 604-05 (quoting *Askinuk Corp. v. Lower Yukon Sch. Dist*., 214 P.3d 259, 264 (Alaska 2009)).

[14]     *Cummins, Inc. v. Nelson*, 115 P.3d 536, 541 (Alaska 2005).

[15]     12 RICHARD A. LORD, WILLISTON ON CONTRACTS § 35:12 (4th ed. 1990).

(2) he admitted in his answer in the administrative hearing that Megan had "set forth very clear rules . . . to stay out of the dog kennel").

My comments above are based on the assumption that the facts recited are true. On remand, the animal control officer must determine the true facts, and by this I mean all of the relevant facts. Then he must correctly apply the law of trespass and agency, if warranted. Thus I agree with the court's order vacating the superior court's decision and remanding this case to the animal control officer.