Ralph **KAVORKIAN, Individually and as Personal Representative of the Estate of Gladys Marie Kavorkian. Sarah Kavorkian, and Fred Brantingham, Individually and as Father and Best Friend of the Deceased, Tonya Brantingham, and Martha Brantingham, Appellants, Cross-Appellees,**

v.

**TOMMY'S ELBOW ROOM, INC., d/b/a Tommy's Elbow Room, Appellee, Cross-Appellant.**

Nos. S–62, S–79.

Supreme Court of Alaska.

Jan. 25, 1985.

John V. Acosta and Marcus R. Clapp, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellants, cross-appellees.

Lloyd Hoppner and Joseph L. Paskvan, Rice, Hoppner, Brown & Brunner, Fairbanks, for appellee, cross-appellant.

Before BURKE, C.J., RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

### I. FACTS.[1]

On October 5, 1981, Richard Pears finished work at 4:30, lingered there for a beer, and then went to Los Amigos, a Fairbanks bar, to watch Monday Night Football. He stayed for some 2½ hours, drinking with friends. Pears and his friend, Kathy Hill, then drove to Hill's house. According to Hill, Pears drove fast and recklessly, running stop signs, yield signs, and red lights. After a short stay at the house, Pears drove Hill in similar reckless style to Tommy's Elbow Room, a bar located on Second Avenue in downtown Fairbanks. At Tommy's they played foosball and drank two rounds of White Russians, with Hill buying at least one round at the bar.

They left Tommy's about 8:30 p.m., and walked across Second Avenue to Pears' pickup. While crossing the street, they were stopped by two Fairbanks policemen, Sergeant Miller and Officer Stepp. After observing their inebriated state, Stepp warned both Pears and Hill not to drive.

---

1. For a concise account of the facts leading up to Richard Pears' accident, see *Pears v. State*, 672 P.2d 903, 909 (Alaska App.1983), in which the court of appeals affirmed Pears' conviction for second-degree, "extreme indifference", murder.

Pears and Hill walked away from the truck until the police were out of sight. Then they returned to the truck, and drove off, with Pears at the wheel. He dropped Hill off at a nearby service station where her car was being repaired. Hill urged Pears to stay there, and not drive home. But he drove—north to Airport Road, east to the Steese Highway, and then north on the Steese.

Pears did not attempt to brake for the red light at 3rd Avenue. Instead, he tried to pass the cars that were stopped at the light by driving through the intersection in the right turn lane. He ran into Marie[2] Kavorkian's Datsun, killing her and Tonya Brantingham, and seriously injuring Sarah Kavorkian, Marie's 20-year old daughter. Officer Stepp arrived at the crash site to find Pears in the same intoxicated condition that he had observed earlier. Pears registered a blood alcohol level of .17 percent on the breathalyzer.[3]

## II. PROCEEDINGS.

Ralph and Sarah Kavorkian and Fred and Martha Brantingham filed suit in the superior court against Pears, Los Amigos, and Tommy's Elbow Room. Ralph Kavorkian is Marie Kavorkian's widower and Sarah Kavorkian's father. Fred and Martha Brantingham were Tonya Brantingham's parents. They sought damages under Alaska's wrongful death statutes, alleging that Pears had recklessly and intentionally caused the collision and that in serving him liquor Tommy's and Los Amigos had breached common-law and statutory duties owed to the plaintiffs. Sarah Kavorkian sought compensation for her injuries. The plaintiffs (hereinafter Kavorkian) also sought punitive damages against all defendants. After entering into a $538,-225.00 settlement with Los Amigos, Kavorkian amended the complaint to add as defendants Steve and Gloria Paskvan, Tommy's managers, and to allege that Fred and Martha Brantingham had suffered direct damage, in that Pears and Tommy's had caused them severe emotional distress.

The superior court ruled that Tommy's was negligent as a matter of law under the State dram-shop statutes, AS 04.16.030 and AS 04.21.080, due to the failure of its bartender to attempt to determine the physical condition of Richard Pears before Pears was provided with alcoholic beverages. On a petition for review, this court reversed that ruling without an opinion. Meanwhile, the trial court dismissed the common-law claims against Tommy's, holding that the legislature's comprehensive revision of the dram-shop statutes had eliminated the common-law cause of action. The court denied motions to dismiss all other claims, but decided to sever Kavorkian's punitive damages claims from the compensatory damages claims, the latter to be tried first.

At trial, the parties differed as to several jury instructions. The superior court refused to give two of Kavorkian's proposed instructions, which were intended to supplement the statutory definitions of "drunken person" and "criminal negligence." On the issue of whether Tommy's' actions had been a legal cause of the accident, the superior court ruled, during the trial, that Tommy's would not be able to introduce evidence that the drinks Tommy's served Pears could not have contributed to his level of intoxication. The superior court decided to give only a standard proximate cause instruction.

The jury concluded that Tommy's was not liable to Kavorkian. It awarded damages against Pears, who had admitted his negligence, as follows:

```
For Gladys Marie Kavorkian's
  wrongful death:
    For Ralph Kavorkian ............. $ 60,000
    For Sarah Kavorkian ............. $ 50,000
For Gladys Marie Kavorkian's pain
  and suffering .................... $ –0–
For Tonya Brantingham's wrongful
  death ........................... $150,000
```

**2.** Gladys Marie Kavorkian called herself and was known as Marie.

**3.** A blood alcohol level of over .10 percent establishes a conclusive presumption of intoxication under Alaska's D.W.I. statute, AS 28.35.030.

For Tonya Brantingham's pain and
suffering ........................$ –0–
For Sarah Kavorkian's injuries ......$ 50,000
For Fred Brantingham's emotional
distress ........................$ 40,000
For Martha Brantingham's emotional
distress ........................$ 40,000
Total.............................$390,000

Kavorkian thereafter moved for a new trial against Pears and for J.N.O.V. or, in the alternative, a new trial against Tommy's. The superior court agreed that the jury's damage award against Pears was inadequate and ordered a new trial. Kavorkian's other motions were denied. Contending that the plaintiffs should have been granted J.N.O.V. against Tommy's or at least a new trial, Kavorkian now appeals. Pears' retrial has been pending resolution of this appeal.

### III. APPEAL.

#### A. J.N.O.V./Directed Verdict.[4]

■ In reviewing a denial of a motion for directed verdict or a motion for J.N.O.V. this court asks whether, viewing the evidence in the light most favorable to the non-moving party, reasonable jurors could differ in their assessment of the particular issue. *Blackford v. Taggart,* 672 P.2d 888, 890 (Alaska 1983). We will not "weigh conflicting evidence or judge of the credibility of witnesses." *Grimes v. Haslett,* 641 P.2d 813, 819 (Alaska 1982).

**4.** Kavorkian attacks the superior court's denial of his motions for directed verdict and J.N.O.V. independently. Since the same standard is used to review such denials, we will discuss these two arguments together. For convenience's sake we will include both the J.N.O.V. motions and the directed verdict motions in our references to J.N.O.V. motions.

**5.** AS 04.16.030 provides:
*Sale or disposition of alcoholic beverages to drunken persons.* A licensee, his agent, or employee may not with criminal negligence
(1) sell, give, or barter alcoholic beverages to a drunken person;
(2) allow another person to sell, give, or barter an alcoholic beverage to a drunken person within licensed premises;
(3) allow a drunken person to enter and remain within licensed premises or to consume an alcoholic beverage within licensed premises;

Kavorkian argues that the superior court erred by denying his J.N.O.V. motions on three different issues. These issues correspond to the three primary elements of a cause of action predicated on AS 04.16.030 and AS 04.21.020:[5] (1) Did Tommy's act with "criminal negligence" in serving Pears that evening, (2) was Pears a "drunken person" while in Tommy's that evening, and (3) was Tommy's conduct a proximate cause of the accident?

#### 1. "Criminal Negligence".

■ Under AS 04.16.030, Tommy's is liable to Kavorkian only if it acted with criminal negligence in serving Pears.[6] "Criminal negligence" is defined as follows:

a person acts with "criminal negligence" with respect to a result or to a circumstance described by a provision of law defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists; the risk must be of such a nature and degree that the failure to perceive it constitutes a *gross deviation from the standard of care that a reasonable person would observe* in the situation;

AS 04.21.080(a)(1) (emphasis added).

Viewing the evidence in the light most favorable to Tommy's, we conclude that reasonable jurors could have disagreed on

(4) permit a drunken person to sell or serve alcoholic beverages.
AS 04.21.020 provides:
*Civil liability of persons providing alcoholic beverages.* A person who provides alcoholic beverages to another person may not be held civilly liable for injuries resulting from the intoxication of that person unless the person who provides the alcoholic beverages holds a license authorized under AS 04.11.080—04.-11.220, or is an agent or employee of such a licensee and
. . . .
(2) the alcoholic beverages are provided to a drunken person in violation of AS 04.16.030.

**6.** Prior to the enactment of AS 04.16.030 in 1980, only ordinary rather than "criminal" negligence had to be proved. *See Nazareno v. Urie,* 638 P.2d 671, 673 & n. 1 (Alaska 1981).

the question of whether the employees of Tommy's acted with criminal negligence in serving Pears.

Kavorkian emphasizes that Tommy's' bartender, Terry Costello, not only failed to observe Pears and Hill enter Tommy's, but also never examined Pears before serving drinks which Costello knew were intended for Pears.[7] Relying on the legislative history of AS 04.16.030, Kavorkian argues that Tommy's had an affirmative duty to assess Pears' sobriety before serving him.

The legislative history of AS 04.16.030 supports Kavorkian's argument that the statute does impose an affirmative duty on the employees.

> This section places a duty upon the seller ... of intoxicating beverages before he or she sells ... intoxicating beverages to a person to use their powers of observation to see that which can easily be seen, and hear that which can easily be heard ... and to determine whether the person is ... drunken.

Senate Journal, Supplement No. 23, Vol. 1, pp. 15–16 (1980).

Costello, the bartender, testified that he did not become aware that Pears was in the bar that night until Pears was leaving. Before that time, however, Costello had seen Hill playing foosball with a man, and had served her drinks at the bar which she took back to the foosball table. Costello observed "nothing abnormal" about the way they were playing foosball. Costello explained his failure to observe Pears before providing him drinks by noting that the foosball table is "part of the waitress' station."[8] When Costello saw Pears leave, Pears looked "fine—no problem."

Arguably, Costello satisfied his statutory duty of "see[ing] that which can easily be seen, and hear[ing] that which can easily be heard." Whether his failure to observe Pears more closely before serving him alcohol "constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation," AS 04.21.-080(a)(1), is a question for the jury. Indeed, another passage in the legislative history of AS 04.16.030 specifically states:

> On the charge of selling ... intoxicating liquor to a drunken person, the facts constituting the alleged outward manifestations should be presented, and it is ordinarily the province of a jury to determine whether or not they were such as to be observable and recognizable as the usual indications of a drunken or overly intoxicated person.

Senate Journal, Supplement No. 23, Vol. 1, p. 16 (1980). In light of the legislative history and Costello's testimony, we hold that reasonable jurors might well have disagreed on whether Tommy's acted with criminal negligence in serving Pears alcohol. We thus conclude that the superior court's denial of Kavorkian's motion for J.N.O.V. on this basis was not error.

2. "Drunken Person".

Under AS 04.21.080(b)(7) the term "drunken person" is defined as:

> a person whose physical or mental conduct is substantially impaired as a result of the introduction of an alcoholic beverage into his body and who exhibits those plain and easily observed or discovered outward manifestations of behavior commonly known to be produced by the overconsumption of alcoholic beverages[.]

In arguing that the superior court erred by denying the J.N.O.V. motion as to whether Pears was a "drunken person" when he was served at Tommy's, Kavorkian relies upon six witnesses who testified that they thought that Pears was very intoxicated that evening. Twelve witnesses for Tommy's, however, testified that they did not think Pears was drunk. In light of the applicable standard of review, under which this court is not to weigh conflicting evidence or to judge the credibility of wit-

---

**7.** Some uncertainty surrounds the question of how Pears got his first drink at Tommy's that night. While Costello remembered serving Hill two rounds (four drinks) of "White Russians" at the bar, Hill was unsure whether the waitress had served them the first round at the table.

**8.** The waitress on duty that night, Angela Wallace, remembered nothing about the evening.

nesses, *Grimes v. Haslett*, 641 P.2d at 819, we conclude that reasonable jurors might well have disagreed about whether Pears was a drunken person within the meaning of the relevant statutes.

Pears admitted that he was drunk on the night of the accident. He further agreed that he was "physically and mentally substantially impaired" while in Tommy's. Kathy Hill, who spent a substantial portion of the evening with Pears, testified that Pears was staggering when they arrived at her house. Pears broke a lotion bottle while using Hill's bathroom. His driving, both between Los Amigos and Hill's house and between Hill's house and Tommy's, was "fast and reckless." He experienced difficulty walking to the foosball table once inside Tommy's. At the service station Pears was staggering and slurring his words.

Tommy's emphasizes other passages from Hill's testimony. Pears' conduct while playing foosball "wasn't bad". He operated the controls without difficulty. He did not spill his drink and was not loud or abusive at Tommy's. In Hill's opinion, Pears' reckless driving that evening was due not to a lack of control over the truck, but rather to his disregard for the rules of the road.

Other witnesses, who observed Pears for a shorter period of time than did Hill, formed various opinions about his sobriety.[9] Joseph Wotopka, who saw Pears leave Los Amigos, described him as "wasted", and saw him bang into a table on his way out. Milo and Iris Jackovich talked and drank with Pears for some twenty minutes earlier in the evening at Los Amigos. They both testified that he seemed fine, not drunk.

Two[10] of the three witnesses who saw Pears at Hill's house testified that he ap-

peared to be drunk and one[11] testified that he did not. Of the three witnesses (other than Hill) who saw Pears at Tommy's, one[12] said that he was "obviously drunk" and two[13] testified that he was not. Three more witnesses testified about Pears' condition at the scene of the accident. Richard Monsey, who found Pears in his truck after the crash, watched him do a "back flip" out of the passenger door and land on his feet. Monsey testified that Pears "looked like he'd been drinking a little bit". Officer Whitney testified that he didn't think Pears met the definition of a "drunken person" within the meaning of the statutes. Isaac Tolliver also witnessed Pears' back flip, but suspected that Pears might have been drinking only on the basis of what Pears said after the accident.

Obviously, the foregoing testimony is conflicting. The legislative history of AS 04.16.030, as noted previously, reflects an intent to let the jury evaluate whether or not a patron of a bar has exhibited such "outward manifestations" as to be recognizable as a drunken person. We conclude that reasonable jurors might well have disagreed over the extent, if any, of Pears' physical and mental impairment. The superior court thus acted properly in denying Kavorkian's J.N.O.V. motion on the issue of whether Pears was a "drunken person".

3. **Proximate Causation.**

■ The superior court ruled that Tommy's could not argue, or present evidence, that Pears had already had so much to drink by the time he got to Tommy's that the two drinks consumed there did not make any difference. The superior court based its ruling on *Yukon Equipment, Inc. v. Gordon*, 660 P.2d 428, 433 (Alaska 1983), where this court recognized that "the 'but for' rule [of causation] is inappli-

---

9. Testimony concerning Pear's condition shortly before and after his visit to Tommy's is circumstantially relevant to the determination of Pear's condition at Tommy's.

10. Nikki Blair (Kathy Hill's sister) and James Lurhs.

11. David Hill, Kathy's husband.

12. Kristina Hall, an off-duty waitress at Tommy's.

13. Andrew Lundquist, a customer, and Terry Costello, the bartender.

cable in the situation where two or more forces operate to bring about an injury."

Reiterating its prior ruling at a later stage in the trial, the superior court relied on *Nazareno v. Urie,* 638 P.2d 671, 677 (Alaska 1981), where we stated that:

[a]ccepting an argument that bar owners cannot be held liable for continuing to serve an intoxicated patron because the patron would have committed the same acts without the additional alcohol would be contrary to the public policy at stake in prohibiting service to intoxicated persons.

Kavorkian argues that the superior court's rulings "established as a proximate cause of the fatal collision the drinks Tommy's served Pears that evening." Thus, Kavorkian claims that the superior court erroneously denied its J.N.O.V. motion as to the issue of proximate causation. We hold that the question of causation was properly submitted to the jury.

Restatement (Second) of Torts § 434 (1977) describes the respective functions of court and jury with regard to the issue of causation:

(1) It is the function of the court to determine

(a) whether the evidence as to facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff;

(b) whether the harm to the plaintiff is capable of apportionment among two or more causes; and

(c) the questions of causation and apportionment, in any case in which the jury may not reasonably differ.

(2) It is the function of the jury to determine, in any case in which it may reasonably differ on the issue,

(a) whether the defendant's conduct has been a substantial factor in causing the harm to the plaintiff, and

(b) the apportionment of the harm to two or more causes.[14]

The superior court ruled that Tommy's could not argue that the accident would have occurred without any act by Tommy's. This does not mean that the jury could not or should not have considered Pears' pre-existing inebriation in evaluating whether Pears' consumption of two drinks at Tommy's was a substantial factor in bringing about the accident.[15]

In light of the evidence indicating that Pears was intoxicated before he arrived at Tommy's, and the different inferences of causation that such evidence might support, we conclude that the superior court did not err by requiring that the jury decide whether Tommy's act of serving alcohol to Pears proximately caused the accident.

**B. Instructions**

■ In addition to moving for J.N.O.V., Kavorkian moved alternatively for a new trial, arguing that the superior court erred by not giving three proposed jury instructions. These instructions parallel the three issues on which he sought, and was properly denied, J.N.O.V.'s. When reviewing a trial court's denial of a proposed instruction, our inquiry focuses upon whether the instructions given, when read as a whole, adequately inform the jury of the relevant law.[16]

**1. Proposed Instruction No. 5: "Criminal Negligence".**

■ The superior court instructed the jury as to the definition of criminal negligence (set forth previously in this opinion) but refused to give an instruction proposed by Kavorkian which read as follows:

**14.** *See also* Restatement (Second) of Torts § 433B Comment b (1977) ("questions [of causation] are normally for the jury, and the court may seldom rule on them as matter of law"); *Sharp v. Fairbanks North Star Borough,* 569 P.2d 178, 183 (Alaska 1977).

**15.** *See Nazareno v. Urie,* 638 P.2d 671, 677 n. 10 (Alaska 1981).

**16.** *See Searfus v. Northern Gas Co.,* 472 P.2d 966, 970 (Alaska 1970); *Perzinski v. Chevron Chem. Co.,* 503 F.2d 654, 660 (7th Cir.1974).

I have instructed you as to the duties imposed upon a liquor licensee, its agents and employees in connection with dispensing alcoholic beverages. This law places a duty upon the seller, server, or giver of intoxicating beverages before he or she sells, serves, or gives intoxicating beverages to a person to use their powers of observation to see that which can easily be seen, and hear that which can easily be heard, under the existing conditions and circumstances and to determine whether the person is so far under the influence of intoxicating beverages that his conduct and demeanor are drunken and such drunken conduct and demeanor should be reasonably discernible to a person of ordinary experience in dispensing alcoholic beverages who has a duty to observe persons to whom alcoholic beverages are dispensed.

The use of intoxicating liquor by the average person in such quantity to produce drunkeness causes many commonly known outward manifestations which are "plain" and "easily seen or discovered" and when such manifestations exist and a licensee, his agent, or employee still sells, serves, or gives to a person so affected, he has violated this section whether this was because he failed to observe that which was plain or easily seen or discovered, or because having observed, he ignored that which was apparent.[17]

Kavorkian contends that this instruction would have enabled the jury to better understand the duties imposed on a liquor vendor by AS 04.16.030. Tommy's argues that the statutory definition is sufficiently clear, and that no reference to legislative history consistent with that definition is necessary.

In our opinion, neither the statutory definition of "criminal negligence" nor the proposed instruction clearly elucidate the duty

of care imposed by AS 04.16.030. The definition itself is, regrettably, quite abstract. However, the phrase "gross deviation from the [reasonable person] standard of care" does give the jury rough guidance. Juries are routinely asked to evaluate degrees of negligence and recklessness no more clearly delineated than those described by this statute.[18] Therefore, we hold that the superior court did not commit error in refusing to give Kavorkian's proposed instruction on "criminal negligence."

### 2. Proposed Instruction No. 4: "Drunken Person"

■ As noted previously, AS 04.21.080(b)(7) defines "drunken person" in part as one "whose physical or mental conduct is substantially impaired" by consumption of alcohol. Kavorkian's proposed instruction no. 4 read as follows:

The phrase "substantially impaired" as used in these instructions, means a physical or mental impairment that is real, true, or actual and is not seeming, imaginary, illusory or nominal in nature.

Instead of using Kavorkian's proposed instruction, the superior court simply told the jury the statutory definition of "drunken person". Thus, the question is whether the statutory definition itself adequately informed the jury of the controlling law.

While the statutory definition of "drunken person" is not lucid, the instruction offered by Kavorkian would not have clarified its meaning appreciably. Nor is it clear that the proposed instruction reflects the intended meaning of the statutory definition; the legislative history is silent on this issue. We thus conclude that the superior court did not err in refusing Kavorkian's requested instruction on the definition of "drunken person".

---

**17.** This proposed instruction is taken directly from the published legislative history of AS 04.16.030.

**18.** In fact, an identical definition of "criminal negligence" appears in the state criminal code.

*See* AS 11.81.900(a)(4). In prosecutions for such crimes as criminally negligent homicide, AS 11.41.130, the jury must evaluate the defendant's conduct against a statutory definition like that at issue here.

3. Proposed Instruction No. 8: "Proximate Causation".

Kavorkian proposed the following instruction:

On October 5, 1981, Richard Pears was provided alcoholic beverages by Tommy's Elbow Room. Richard Pears consumed those alcoholic beverages while on the premises of Tommy's Elbow Room. This court has found, and you are bound to accept, that the alcoholic beverages provided by Tommy's Elbow Room and consumed by Richard Pears were a contributing factor to Richard Pears' level of intoxication and therefore the collision, on the night of October 5, 1981.

The superior court refused to give this proposed instruction. Instead, it used a standard proximate cause instruction. We hold that the court correctly refused to give this requested instruction for the same reasons that the superior court correctly denied Kavorkian's motion for directed verdict and J.N.O.V. motion on this point. Causation was properly a question for the jury.[19]

AFFIRMED.[20]

19. The position of the superior court on this issue represented a compromise between two extremes. The court could have allowed Tommy's to argue that Pears was so drunk when he got there that his two drinks there made no difference. Alternatively, the court could have granted Kavorkian's requested directed verdict on the causation issue or at least given proposed instruction no. 8. The first approach would violate the policies recognized in *Nazareno v. Urie*, 638 P.2d 671, 677 (Alaska 1981), while the second approach would improperly remove the issue of causation from the jury's province.

In *Nazareno* a bar patron was injured when another patron (Welch) collided with her on the dance floor. We concluded that despite testimony indicating Welch was intoxicated at the time he was served drinks at Urie's bar, this did not negate "an inference that drinks served to Welch after he was intoxicated contributed substantially to his continuing intoxication" and thus a reasonable jury would not be precluded from finding the defendant Urie responsible for the injury that took place. *Id.* at 677. Further, in *Nazareno* we explicitly stated that although a jury could so conclude, it "would not be compelled to so so." *Id.* at 677, n. 10. Thus, in the instant case, the jury could have reasonably concluded that the two drinks served to Pears at Tommy's did not contribute substantially to his continued intoxication, given the evidence that Pears drank alcohol before arriving at Tommy's.

20. Our disposition makes it unnecessary to address any of the issues raised in the cross-appeal.