*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CITY OF HOOPER BAY, | ) | |
| | ) | Supreme Court No. S-15533 |
| Appellant, | ) | |
| | ) | Superior Court No. 4BE-12-00384 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JUDY BUNYAN, individually and | ) | |
| as Personal Representative of | ) | No. 7048 – September 11, 2015 |
| Louis Bunyan, deceased, and on | ) | |
| behalf of Sean Bunyan and Kayla | ) | |
| Smith, minor children, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Charles W. Ray, Jr., Judge.

Appearances: William H. Ingaldson, Ingaldson Fitzgerald, P.C., and Barry J. Kell, Kell & Associates, P.C., Anchorage, for Appellant. David Henderson, Law Offices of David Henderson, and Jim Valcarce, Valcarce Law Office, LLC, Bethel, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, and Bolger, Justices. [Maassen, Justice, not participating.]

FABE, Chief Justice.

## I. INTRODUCTION

A 21-year-old intoxicated Hooper Bay resident committed suicide while he was detained in a holding cell by the City of Hooper Bay. His mother filed a wrongful

death action against the City, alleging that the City's negligence led to her son's death. She sought damages in her individual capacity and on behalf of her son's estate and her son's minor children. The case proceeded to a jury trial and the jury returned a $1,078,233 judgment against the City. The City appeals, raising a number of issues, and we affirm the superior court's rulings in many respects. But we vacate the jury's damages award and remand for further proceedings on the issue of allocation of fault between the City and the deceased under AS 09.17.080.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

On July 28, 2011, 21-year-old Hooper Bay resident Louis Bunyan hanged himself with the drawstring from his sweatpants while in the custody of the Hooper Bay Police Department (HBPD). In the early morning hours of July 28, Louis had arrived intoxicated at his mother Judy Bunyan's home where he lived with his siblings. Louis became agitated and had to be subdued by his two brothers, Keith Bunyan and Larry Bunyan. Louis's sister, Louise Bunyan, called the HBPD and reported that Louis was intoxicated and fighting with family members. Village Police Officers Robert Tinker and Walter Naneng responded and took Louis into custody inside of Judy's home. Officers Tinker and Naneng removed Louis from the home and transported him on a four-wheeler to the police station.

Officer Baylen Toots, the on-duty dispatcher and jailer at the police station, later testified that Louis was highly intoxicated when he arrived at the police station. Officer Toots testified that Louis's sister, Louise, had called dispatch at 4:07 a.m.; Louis was placed in cell number 4 at 4:31 a.m.; Louis was found "hanging with a string tied . . . around his neck, unresponsive" at 5:10 a.m.; and responders pronounced Louis dead at 5:30 a.m.

Officers Tinker and Toots testified that upon taking Louis into custody they engaged in routine safety checks. Officer Tinker testified that he checked Louis's HBPD computer records but that he did not find any information about Louis. In fact four HBPD records existed, each documenting separate incidents in which Louis had threatened suicide. Photographs taken after Louis's death revealed horizontal scarring on his forearms, providing additional evidence of past self-harm.

Officer Tinker testified that he and Officer Naneng searched Louis together. Officer Naneng described a "pocket check" in which they "took the stuff out of [Louis's] pockets[ and checked] if he had anything in his pockets to hurt himself." Both Officers Tinker and Naneng testified that they checked Louis's pants for a drawstring. Officer Naneng testified that he saw the drawstring but did not remove it because he "couldn't do a strip-down search." Although Officers Tinker and Naneng did not remove Louis's drawstring, they did remove Louis's laced basketball shoes during the search.

Officer Tinker recalled that Louis was calm and quiet during his intake, but that Louis began crying as he was led to the cell. Once Louis was placed in the cell he began yelling and hitting the walls. Officer Tinker denied a request from Louis for a pen and paper while escorting Louis to the cell. Cell 4, where Louis was held, measured approximately 8' x 4' and received only ambient light from a small window in the door to the cell. Metal fencing covered the window on the door. Louis used this fencing to secure the ligature around his neck during his suicide. Neither Louis's family members nor Officers Naneng, Tinker, or Toots testified that Louis expressed any thoughts or preoccupation with suicide on the night of his death.

Officer Nathan Joseph, an experienced Hooper Bay village police officer and acting Hooper Bay police chief at the time of his deposition following Louis's death, testified that an officer should check on a detainee every five minutes if that detainee was "highly intoxicated." Officers Tinker and Naneng also testified that highly intoxicated

detainees should by checked every five minutes. HBPD policy mandated that Officer Toots should have checked in on Louis every five minutes and should have recorded the time and Louis's condition at each check-up. Officer Toots failed to create this type of record. Officer Tinker testified that Officer Toots did not check in on Louis every five minutes, and Officer Toots testified that both he and Officer Tinker were browsing Facebook while Louis was detained. Although the City asserted that Officer Toots checked in on Louis three to five times between 4:30 a.m. and 5:08 a.m., the superior court noted in its denial of the City's motion for summary judgment that it was plausible that only two checks took place during the 38 minutes of detention before Toots discovered Louis unresponsive in the cell at 5:08 a.m.

## B. Proceedings

Louis is survived by his two children, Kayla and Sean, his mother Judy, and his siblings Larry, Keith, Louise, and Davida. In August 2012 Judy filed a wrongful death action against the City in the Bethel superior court. Her complaint alleged that "[d]ue to the [City]'s negligence, Louis Bunyan died." Judy sought damages in her individual capacity as Louis's dependent and on behalf of Louis's minor children for "loss of contributions or support, pain and suffering, loss of assistance or services, and loss of consortium" under Alaska's wrongful death statute, AS 09.55.580. She also sought damages as the personal representative of Louis's estate for "[t]he harm to Louis Bunyan prior to his death" under AS 09.55.570.

### 1. The City's motions for summary judgment

In August 2013 the City filed two motions for summary judgment. The first motion asserted that the City was entitled to qualified immunity under

AS 09.65.070(d)(2).[1] The City argued that qualified immunity attached to the decision by Officers Naneng and Tinker to place Louis under protective custody; to the pat down search of Louis upon arrival at the police office; and to the periodic checks made by Officer Toots while Louis was detained. The City also argued that it was entitled to immunity under the immunity provisions of AS 47.37.[2] Simultaneously, the City filed a motion for summary judgment that alleged that Judy was not a dependent of Louis at the time of his death and therefore was prohibited from recovering under AS 09.55.580 as a matter of law. Judy opposed both motions.

The superior court denied the City's motion for summary judgment regarding Judy's status as a dependent of Louis because "numerous questions of fact preclude[d] the grant of summary judgment." It noted that the City's factual position

---

[1]     AS 09.65.070(d)(2) provides that

> [a]n action for damages may not be brought against a municipality or any of its agents, officers, or employees if the claim . . . is based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty by a municipality or its agents, officers, or employees, whether or not the discretion involved is abused.

[2]     AS 47.37.170(g) provides:

> A person may not bring an action for damages based on the decision under this section to take or not to take an intoxicated person or a person incapacitated by alcohol or drugs into protective custody, unless the action is for damages caused by gross negligence or intentional misconduct.

AS 47.37.235(b)(4) provides that "a peace officer or other person responsible for detaining or transporting a person under AS 47.37.170-47.37.270" may not be held civilly or criminally liable "for detaining or failing to detain a person under AS 47.37.170-47.37.270 . . . if the [peace officer or other person has] performed [his duty] in good faith and without gross negligence."

was at odds with the affidavit of Judy Bunyan and economic loss reports submitted by Judy's economist, Francis Gallela. The superior court concluded that "[s]ince reasonable jurors could conclude from the evidence that there is a factual basis for Judy's claim for loss of support, the motion must be denied."

Addressing the City's qualified immunity motion for summary judgment, the superior court first determined that the City owed its detainees a duty of reasonable care to protect them from reasonably foreseeable harm, including self-inflicted harm. With regard to the decision to arrest Louis, the superior court found that "[t]he act of taking Louis into custody was a discretionary action undertaken by HBPD officers." The superior court determined that the decision to arrest Louis was objectively reasonable under the circumstances and that "as to the decision to take Louis into custody, whether protective or otherwise, the City is entitled to discretionary immunity."

The superior court then rejected the City's assertion that because there was no requirement that the officers search Louis, the search itself was a discretionary act. The superior court noted that the decision to search Louis might be discretionary but that once that decision to search had been made, the manner of executing the search was not a discretionary act. Similarly, the court concluded that because the City conceded that a protocol existed for checking on detainees, "the operational performance of that check is not discretionary and must be performed non-negligently." The superior court also concluded that the records check conducted by Officer Tinker was not subject to discretionary action immunity because while the decision to check records may have been discretionary the actual manner of performance of the check was not.

Turning to the City's argument that it was entitled to immunity pursuant to AS 47.37.170 and AS 47.37.235, the superior court concluded that Title 47 applied only to the detention of intoxicated persons from public places. Because Louis was removed from Judy's home, the superior court concluded that the statutes were inapplicable. Thus

the superior court granted the motion for summary judgment on the issue of qualified immunity for taking Louis into custody and denied all of the City's other immunity arguments.

## 2.    The City's motion in limine

Prior to trial, the City filed a motion in limine to exclude testimony it anticipated would be presented by Gallela, the economist Judy had hired, regarding the economic loss attendant to Louis's death.  The City argued that Gallela's economic loss report ignored contradictory testimony from the family's depositions and that his report was too speculative to survive application of the *Daubert* factors[3] for assessing the credibility of scientific testimony.  The City also argued that Gallela's testimony was not sufficiently reliable to be allowed under Alaska Rule of Evidence 703.

Judy opposed the City's motion, arguing that under Alaska law a *Daubert* hearing was not a prerequisite for the admission of economic loss testimony and that Gallela was a highly qualified economic expert.  The superior court denied the City's motion and allowed Gallela to testify, concluding that "[t]he City's objections . . . go to the weight of the testimony and opinions, not their admissibility."

## 3.    Jury trial

The case proceeded to trial in January 2014.  The City filed three motions for directed verdict at the close of Judy's case-in-chief, arguing (1) that the evidence did not support a finding that Louis's suicide was reasonably foreseeable and that the City therefore had no duty to prevent it, (2) that there was insufficient evidence to support an award of economic damages, and (3) that there was insufficient evidence to support a finding that Judy was a statutory beneficiary of Louis under AS 09.55.580.  The superior

---

[3]    *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-94 (1993); *State v. Coon*, 974 P.2d 386, 390 (Alaska 1999).

court denied each of these motions. The City also proposed jury instructions and a special verdict form that the superior court rejected.

The jury found that the City was negligent and awarded $960,000 in damages owed to Judy and Louis's two minor children. The jury did not award any damages for Louis's pre-death pain and suffering. The superior court entered a $1,078,233 judgment against the City, which included attorney's fees, costs, and interest. The City appeals.

## III.   STANDARDS OF REVIEW

"We review grants of summary judgment de novo."[4] We review de novo the denial of a directed verdict to "determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment."[5] When reviewing the disposition of a motion for a directed verdict, "we will not 'weigh conflicting evidence or judge the credibility of witnesses.' "[6]

"We interpret statutes 'according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters.' "[7] "We decide questions of statutory interpretation on a sliding scale: '[T]he

---

[4]     *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 516 (Alaska 2014).

[5]     *Cummins, Inc. v. Nelson*, 115 P.3d 536, 541 (Alaska 2005) (quoting *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 722 (Alaska 2003)) (internal quotation marks omitted).

[6]     *Dura Corp. v. Harned*, 703 P.2d 396, 408 (Alaska 1985) (quoting *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 220 (Alaska 1978)).

[7]     *Marathon Oil Co. v. State, Dep't of Natural Res.*, 254 P.3d 1078, 1082 (Alaska 2011) (quoting *Native Village of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

plainer the language of the statute, the more convincing contrary legislative history must be.' "[8]

"The existence and extent of a duty of care are questions of law which we review de novo."[9] "Jury instructions involve questions of law to which we apply our independent judgment."[10] "When reviewing a trial court's denial of a proposed instruction, our inquiry focuses upon whether the instructions given, when read as a whole, adequately inform the jury of the relevant law."[11] "An error in jury instructions is grounds for reversal only if it caused prejudice."[12] "In evaluating whether there has been prejudicial error with regard to jury instructions, we put ourselves in the position of the jurors and 'determine whether the error probably affected their judgment.' "[13]

"We generally review a trial court's decision to admit expert testimony for abuse of discretion."[14] "Where the admissibility of expert testimony turns on a question of law, such as the 'correct scope or interpretation of a rule of evidence,' we apply our

---

[8]     *Id.* (alteration in original) (quoting *Alaskans for Efficient Gov't, Inc. v. Knowles*, 91 P.3d 273, 275 (Alaska 2004)).

[9]     *State v. Sandsness*, 72 P.3d 299, 301 (Alaska 2003) (citing *Beck v. State, Dep't of Transp. & Pub. Facilities*, 837 P.2d 105, 109 (Alaska 1992)).

[10]     *Thompson v. Cooper*, 290 P.3d 393, 398 (Alaska 2012) (citing *L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1118 (Alaska 2009)).

[11]     *Id.* (quoting *Kavorkian v. Tommy's Elbow Room, Inc.*, 694 P.2d 160, 166 (Alaska 1985)) (internal quotation marks omitted).

[12]     *Id.* at 398-99 (alteration omitted) (quoting *State, Dep't of Corr. v. Johnson*, 2 P.3d 56, 59 (Alaska 2000)) (internal quotation marks omitted).

[13]     *Id.* at 399 (quoting *Reich v. Cominco Alaska, Inc.*, 56 P.3d 18, 25 (Alaska 2002)).

[14]     *Id.* at 398.

'independent judgment, adopting the rule most persuasive in light of reason, precedent and policy.' "[15]

## IV.   DISCUSSION

The City makes several arguments on appeal.  It argues that it cannot be held liable in tort because it was under no duty to prevent Louis's suicide.  The City argues that if it did owe a duty of care to Louis while he was held in protective custody, then it was entitled to summary judgment on the grounds that its actions were protected by the doctrine of qualified immunity under either AS 09.65.070(d)(2) or AS 47.37.  The City argues that the superior court erred in denying its motions for directed verdict because the evidence presented in Judy's case-in-chief was insufficient for reasonable persons to conclude that Louis's death was foreseeable and insufficient for a jury to conclude that Judy was financially dependent on Louis.

Alternatively, the City argues that we must remand the case for a new trial because the superior court did not properly include an instruction regarding foreseeability and because the superior court instructed the jury that the City owed Louis a heightened duty of care.  The City argues instead that its liability was limited to grossly negligent acts and intentional misconduct.  Regarding damages, the City argues that the superior court erred by allowing the introduction of Gallela's economic loss testimony and by failing to instruct the jury to allocate fault between Louis and the City as required by AS 09.17.080.  In particular, it challenges jury instruction 20 on the ground that it prevented the jury from allocating damages between Louis and the City as required by AS 09.17.080.

---

[15]     *Id.* at 349-50 (quoting *City of Bethel v. Peters*, 97 P.3d 822, 825 (Alaska 2004)).

**A.** **The Superior Court Did Not Err In Denying The City's Motion For Summary Judgment On The Ground That It Was Entitled To Qualified Immunity Under AS 09.65.070(d)(2).**

"In negligence cases, we treat duty as the threshold issue because 'conceptually, the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity.' "[16] Here, the City owed Louis a "duty of reasonable care to protect a prisoner from unreasonable risks of harm."[17] This duty "encompasses reasonably foreseeable suicide attempts."[18] Contrary to the City's argument on appeal, "the intentionality of a prisoner's suicide should not altogether excuse that duty."[19] Last year in *Achman v. State* we held that "[j]ailers owe their prisoners a duty 'to exercise reasonable care for the protection of [the prisoners'] lives and health,' which 'encompasses a duty to prevent self-inflicted harm that is reasonably foreseeable.' "[20] We went on to explain that a "jailer must exercise a higher degree of care when the jailer knows or reasonably should have foreseen that the prisoner was incapacitated, suicidal, or otherwise in danger."[21] Because the City owed

---

[16] *Estate of Logusak ex rel. Logusak v. City of Togiak*, 185 P.3d 103, 106 (Alaska 2008) (alteration omitted) (quoting *Div. of Corr., Dep't of Health & Soc. Servs. v. Neakok*, 721 P.2d 1121, 1125 (Alaska 1986)).

[17] *Joseph v. State*, 26 P.3d 459, 474 (Alaska 2001).

[18] *Id.*

[19] *Id.*

[20] 323 P.3d 1123, 1127 (Alaska 2014) (alteration in original) (quoting *Joseph*, 26 P.3d at 466-67).

[21] *Id.* (quoting *State, Dep't of Corr. v. Johnson*, 2 P.3d 56, 60 (Alaska 2000)) (internal quotation marks omitted).

Louis a "duty of reasonable care to protect a prisoner from unreasonable risks of harm,"[22] we reach the City's argument that it was entitled to qualified immunity.

Alaska Statute 09.65.070(d)(2) "immunizes a municipality from exercising or failing to exercise a discretionary function."[23] We have held that "decisions involving basic planning or policy are entitled to immunity, but 'those that are merely operational in the sense that they implement plans or carry out policy' are not."[24] We have also held that "[a]lthough the dividing line between planning and operational decisions may often be hard to discern, . . . 'under the planning [versus] operational test, liability is the rule, immunity is the exception.' "[25]

Here the initial decision to take Louis into custody was discretionary and subject to qualified immunity. But once Louis was in custody, the City was not immunized from liability for the implementation of the operational protocols in place for the detention of intoxicated individuals by its village police officers. Officer Tinker decided to search the police department records for records involving Louis Bunyan. Qualified immunity does not protect the City from the consequences of his failure to adequately implement that search. Officer Joseph testified that it was HBPD policy to check on highly intoxicated detainees every five minutes. That Officer Toots failed to do so was not a discretionary decision entitled to qualified immunity but rather a failure

---

[22]    *Joseph*, 26 P.3d at 474.

[23]    *Cutler v. Kodiak Island Borough*, 290 P.3d 415, 420 (Alaska 2012).

[24]    *Id.* (quoting *Guerrero ex rel. Guerrero v. Alaska Hous. Fin. Corp.*, 123 P.3d 966, 976 (Alaska 2005)).

[25]    *Guerrero*, 123 P.3d at 977 (quoting *State, Dep't of Transp. & Pub. Facilities v. Sanders*, 944 P.2d 453, 457 (Alaska 1997)) (footnote and internal quotation marks omitted).

to carry out the policy.  We affirm the superior court's denial of the City's motion for summary judgment on the basis of AS 09.65.070(d)(2).

B.    **The Superior Court Did Not Err In Denying The City's Motions For Directed Verdict.**

The City appeals the denial of two of its motions for directed verdict, arguing that based on the evidence presented reasonable persons could not conclude that Louis's death was foreseeable or that Judy was financially dependent on Louis and therefore entitled to seek damages under AS 09.55.580(a).  When reviewing motions for directed verdict we "determine whether the evidence, viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment"[26] and will not "weigh conflicting evidence or judge the credibility of witnesses."[27]

But Judy presented substantial evidence from which reasonable persons could conclude that Louis's suicide was reasonably foreseeable.  She introduced four separate police records containing information that Louis had a history of suicidal ideation.  And she presented testimony that these records were available on the computers at the police headquarters.  A post-mortem photograph revealed visible horizontal scarring on Louis's forearms, indicating past self-harm.  Louis's brother testified that Louis was extremely upset about being removed from Judy's home and placed into protective custody, and Kurtelina Bell, the woman detained in the cell next to Louis's, testified that Louis was crying and pounding on the walls of his cell.  Finally,

---

[26]    *L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1117-18 (Alaska 2009) (citing *Holiday Inns of Am., Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974)).

[27]    *Dura Corp. v. Harned*, 703 P.2d 396, 408 (Alaska 1985) (quoting *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 220 (Alaska 1978)) (internal quotation marks omitted).

expert testimony indicated that Alaska Natives commit suicide at a rate five times the national average and that suicide is particularly problematic in rural coastal communities. Because a reasonable person could conclude from this body of evidence that Louis's suicide was reasonably foreseeable, we affirm the superior court's denial of the City's motion for a directed verdict on the question of foreseeability.

Judy similarly introduced sufficient evidence for a reasonable person to conclude that she was Louis's dependent and a qualifying statutory beneficiary under AS 09.55.580(a).[28] In order to recover, a purported beneficiary must make a showing "of actual dependency for significant contributions of support over a sufficient period of time to justify the assumption that such contributions would have continued."[29] Louis's brother Larry testified that Judy depended the most on Louis while he was alive and testified that Louis was the main subsistence provider for the family, providing waterfowl, seal, whale, and moose meat. Larry also testified that Louis did the cooking for the family as well as household chores and repairs. Judy testified that she has had less subsistence food since Louis's death. While the City points out that there was also some testimony that Judy provided financial support for Louis, we do not "weigh conflicting evidence or judge the credibility of witnesses" in evaluating denials of motions for directed verdict on appeal.[30] Because a reasonable person could conclude that Judy was Louis's dependent, we affirm the superior court's denial of the City's motion for a directed verdict.

---

[28] AS 09.55.580 is Alaska's wrongful death action statute. Subsection (a) provides that "[t]he amount recovered, if any, shall be exclusively for the benefit of the decedent's spouse and children . . . or other dependents."

[29] *Greer Tank & Welding, Inc. v. Boettger*, 609 P.2d 548, 551 (Alaska 1980).

[30] *Dura Corp.*, 703 P.2d at 408 (quoting *Whittier Fuel & Marine Corp.*, 577 P.2d at 220) (internal quotation marks omitted).

**C. The Superior Court Did Not Err By Admitting The Economic Loss Testimony And Report Offered By Judy's Expert Witness, Francis Gallela.**

"Alaska Rule of Evidence 702(a) controls the admissibility of expert testimony."[31] Rule 702(a) provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." "We confirmed long ago that 'the standard for admission of expert testimony in Alaska is whether the testimony would appreciably assist the trier of fact.' "[32] And "[a]s a general rule, the trial judge retains wide latitude in deciding whether to admit the testimony of an expert witness."[33]

On appeal the City argues that the superior court erred in admitting Gallela's testimony because it was too speculative and because it did not satisfy the requirements for the admission of scientific or technical evidence. Under Alaska law, "[e]xpert testimony may be based on either: (1) technical or scientific research and testing; or (2) practical experience in the relevant field."[34] In *State v. Coon*[35] we adopted the non-exclusive factors set out by the United States Supreme Court in *Daubert v.*

---

[31] *Barton v. N. Slope Borough Sch. Dist.*, 268 P.3d 346, 350 (Alaska 2012) (citing *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1039 (Alaska 2002)).

[32] *Id.* (quoting *INA Life Ins. Co. v. Brundin*, 533 P.2d 236, 243 (Alaska 1975)).

[33] *Id.* (quoting *Barrett v. Era Aviation, Inc.*, 996 P.2d 101, 103 (Alaska 2000)) (internal quotation marks omitted).

[34] *Id.* (citing *Marsingill v. O'Malley*, 128 P.3d 151, 159 (Alaska 2006)).

[35] 974 P.2d 386 (Alaska 1999).

*Merrell Dow Pharmaceutical, Inc.*[36] to determine whether scientific testimony is sufficiently reliable.[37] But we held in *Marron v. Stromstad*[38] that testimony based on practical experience in a relevant field does not have to meet the heightened requirements outlined by the United States Supreme Court in *Kumho Tire Co. v. Carmichael*,[39] taking note of Alaska's "liberal standard favoring the admissibility of expert testimony . . . to increase the information available to the fact-finder."[40]

Although the City argues that economic loss opinions are generally technical and subject to analysis under the *Daubert* factors, we have never required analysis under *Daubert* as a prerequisite to the admission of expert economic loss testimony.[41] Instead we have held that when "expert testimony is plainly derived from

---

[36]    509 U.S. 379 (1993).

[37]    *See Coon*, 974 P.2d at 395 ("The factors identified in *Daubert* provide a useful approach: (1) whether the proffered scientific theory or technique can be (and has been) empirically tested (i.e., whether the scientific method is falsifiable and refutable); (2) whether the theory or technique has been subject to peer review and publication; (3) whether the known or potential error rate of the theory or technique is acceptable, and whether the existence and maintenance of standards controls the technique's operation; and (4) whether the theory or technique has attained general acceptance." (citing *Daubert*, 509 U.S. at 593-94)).

[38]    123 P.3d 992 (Alaska 2005).

[39]    526 U.S. 137 (1999).

[40]    *Marron*, 123 P.3d at 1005.

[41]    *See, e.g.*, *State Dep't of Transp. & Pub. Facilities v. Miller*, 145 P.3d 521, 524-25 (Alaska 2006); *Reeves v. Alyeska Pipeline Serv. Co.*, 56 P.3d 660, 669 (Alaska 2002).

experience — not from the scientific method — and is not dependent on sophisticated scientific theory, *Daubert* does not apply."[42]

Gallela's testimony here was not based on complex scientific or technical theories, but rather on his experience as an economist working in rural Alaska. In his testimony he presented a variety of hypothetical scenarios in which Louis pursued different careers. Gallela multiplied the average wages by an average career length and discounted the result to present value after accounting for consumption and taxes. Gallela readily noted the difficulty in estimating lifetime economic losses, admitting that "[he didn't] have a crystal ball . . . [and] couldn't tell you exactly what [Louis] would have done."

While the City argues that a lack of specificity warrants the exclusion of Gallela's testimony, we have held that " '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof' — in short, the basic pillars of the adversary system — 'are the traditional and appropriate means of attacking shaky but admissible evidence.' "[43] The City failed to call an expert witness to rebut Gallela's testimony. It was up to the jury to determine how much weight to give Gallela's testimony and the jury's ultimate damage award of $960,000 — less than half of Gallela's $2,200,000 economic loss estimate — signals that the jury carefully considered the City's cross-examination of Gallela's testimony. Because a *Daubert* hearing was not required and because Gallela's testimony "appreciably assist[ed] the trier

---

[42]     *Marron*, 123 P.3d at 1007.

[43]     *Id.* (alteration in original) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993)); *see also Maines v. Kenworth Alaska, Inc.*, 155 P.3d 318, 326 (Alaska 2007) ("[W]eaknesses in data used by an expert in formulating his opinion are properly weighed by the jury after being brought out by cross-examination." (quoting *N. Lights Motel, Inc. v. Sweaney*, 561 P.2d 1176, 1189 (Alaska 1977))).

of fact,"[44] we conclude that the superior court did not err in admitting Gallela's economic loss testimony.

## C. The Superior Court's Jury Instructions

### 1. The superior court did not err by giving an ordinary negligence instruction rather than requiring gross negligence to establish liability.

"We interpret statutes 'according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters.' "[45] The City argues that Louis was taken into protective custody under AS 47.37.170(b), which provides that "[a] person who appears to be incapacitated by alcohol or drugs in a public place shall be taken into protective custody by a peace officer." Alaska Statute 47.37.170(g) establishes that "[a] person may not bring an action for damages *based on the decision under this section to take or not to take an intoxicated person or a person incapacitated by alcohol or drugs into protective custody*, unless the action is for damages caused by gross negligence or intentional misconduct."[46] But here the action for damages was not based on the decision to take Louis into custody. Rather, the action was based on the City's alleged violation of its duty of care to protect detainees from harm, including self-harm.[47] Thus AS 47.37.170(g) does not immunize the City from liability or create a gross negligence standard of care for the actions taken

---

[44] *Barton v. N. Slope Borough Sch. Dist.*, 268 P.3d 346, 350 (Alaska 2012) (quoting *INA Life Ins. Co. v. Brundin*, 533 P.2d 236, 243 (Alaska 1975)) (internal quotation marks omitted).

[45] *Marathon Oil Co. v. State, Dep't of Natural Res.*, 254 P.3d 1078, 1082 (Alaska 2011) (quoting *Native Village of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

[46] AS 47.37.170(g) (emphasis added).

[47] *See Joseph v. State*, 26 P.3d 459, 474 (Alaska 2001).

by the City while Louis was detained.

The City argues that even if AS 47.37.170(g) only applies to the decision whether to take an intoxicated person into protective custody, another provision, AS 47.37.235(b)(4), applies more broadly. That law provides that "a peace officer or other person responsible for detaining or transporting a person under AS 47.37.170-47.37.270"

> may not be held civilly or criminally liable for detaining or failing to detain a person under AS 47.37.170-47.37.270 or for releasing a person under AS 47.37.170-47.37.270 at or before the end of the period for which the person was admitted or committed for protective custody or treatment if the persons have performed their duties in good faith and without gross negligence.[48]

The City argues that this gross negligence standard, and not the ordinary negligence standard announced in some of our cases[49] and used by the superior court in this case,[50] applies to its liability for its officers' conduct while Louis was in custody.

---

[48]        AS 47.37.235(b)(4).

[49]        *See Joseph*, 26 P.3d at 470 (referencing "a jailer's duty of reasonable care" rather than the gross negligence standard); *Achman v. State*, 323 P.3d 1123, 1127 (Alaska 2014) ("Jailers owe their prisoners a duty 'to exercise reasonable care for the protection of [the prisoners'] lives and health,' which 'encompasses a duty to prevent self-inflicted harm that is reasonably foreseeable.' " (quoting *Joseph*, 26 P.3d at 466, 467)).

[50]        Jury instruction 15 predicated the City's liability on the jury finding that the City was negligent, and instruction 16 defined negligence as "[doing] something that a reasonably careful person would not do in the same situation or [failing] to do something that a reasonably careful person would do in the same situation." In contrast, the Alaska Civil Pattern Jury Instruction 3.14 defines gross negligence as "an extreme departure from [the reasonably careful person] standard," and "more than ordinary inadvertence or inattention, but less than conscious indifference to consequences."

We do not agree with the City's interpretation of AS 47.37.235(b)(4). The plain text of the statute only applies the gross negligence standard to "liab[ility] for detaining or failing to detain a person . . . or for releasing a person." The statute's text does not purport to apply the gross negligence standard to actions taken while the person is detained. In this, it mirrors the scope of the immunity provided by AS 47.37.170(g). And like subsection .170(g), it would not apply to the actions taken by the City while Louis was detained.

Legislative history also precludes the City's suggested broad application of AS 47.37.235(b)(4). This immunity section was added to Chapter 37 in 1996 by a law that focused on the procedures by which a person addicted to drugs or alcohol could be involuntarily committed for treatment.[51] Specifically, the law broadened the ability of guardians and public health officials to seek 30-day and 180-day commitments of alcoholics and drug abusers.[52] It did not change the authority of peace officers to take an incapacitated person in a public place into protective custody except to expand that authority to reach incapacity caused by drugs as well as by alcohol.[53] And the legislative history does not suggest that the limited liability provision in section .235 was intended to immunize activities that were previously authorized but not immunized; instead, it was included to "address[] [the] potential for an unintentional increase in liability" from passage of the 1996 law.[54] Thus, both the plain text of the statute and its legislative history demonstrate that the gross negligence standard in subsection .235(b)(4), like that

---

[51] *See generally* ch. 66, SLA 1996.

[52] *See id.* §§ 8, 11, 12.

[53] *See id.* §§ 1-5.

[54] Minutes, Sen. Fin. Comm. Hearing on H.B. 493, 19th Leg., 2nd Sess. (Apr. 29, 1996) (statement of Senator Steve Rieger).

in subsection .170(g), is relevant only to the decision whether to take an individual into custody. Because Judy's claim of negligence concerned the City's actions once Louis was in custody rather than the decision to take him into custody in the first place, the jury instruction stated the appropriate duty of care owed by the City.

> **2. The superior court's jury instructions properly included the reasonable foreseeability element required under *Joseph v. State* and did not require a "heightened" duty of care because Louis was intoxicated.**

Our decision in *Joseph v. State* established that "a jailer's duty of reasonable care to protect a prisoner from unreasonable risks of harm encompasses reasonably foreseeable suicide attempts."[55] In *Achman v. State* we recognized that a "jailer must exercise a higher degree of care when the jailer knows or reasonably should have foreseen that the prisoner was incapacitated, suicidal, or otherwise in danger."[56] Jury instruction 17 provided:

> If a person, when taken into protective custody, is intoxicated, and the police and/or jailers were aware of it or should have been aware of it, they owe him a higher degree of care than they owe to an ordinary sane, sober person in control of his mental and physical faculties. In such instances, they owe such person a duty to reasonably protect him from reasonably foreseeable harm, including harm caused by his own act to himself.

The language of instruction 17 corresponds directly to the legal rules set out in *Achman* and *Joseph*. Although the instruction does not explicitly direct the jury that it must find Louis's suicide reasonably foreseeable in order to hold the City liable, as the City argues was required, it nevertheless states the appropriate legal standard by limiting the City's

---

[55]   26 P.3d 459, 474 (Alaska 2001).

[56]   323 P.3d 1123, 1127 (Alaska 2014) (quoting *State, Dep't of Corr. v. Johnson*, 2 P.3d 56, 60 (Alaska 2000)) (internal quotation marks omitted).

duty to "reasonably protect[ing] [Louis] from reasonably foreseeable harm." Instruction 17 told the jury that if it found that the harm Louis suffered was not reasonably foreseeable, the City had no duty to protect him from that harm. Because the instruction "adequately inform[ed] the jury of the relevant law,"[57] no prejudice resulted from not requiring a specific finding that Louis's suicide was reasonably foreseeable. We affirm the superior court's jury instruction.

> **3. Jury instruction 20 was erroneous because it effectively precluded the jury from allocating fault between Louis and the City as AS 09.17.080 requires.**

At trial the City opposed the superior court's jury instruction number 20 regarding incapacity and allocation of fault. That instruction provided:

<u>Jury Instruction 20</u>

You must decide whether it is more likely true than not true that at the time Louis Bunyan died, City of Hooper Bay employees knew or reasonably should have known that:

    1.    Louis Bunyan was likely to harm himself; <u>or</u>

    2.    Louis Bunyan was not capable of realizing the consequences of his actions; <u>or</u>

    3.    Louis Bunyan was not capable of caring for his own safety.

If the answer to either 1, 2, <u>or</u> 3 is "yes," you may not allocate any fault to Louis Bunyan and must enter "zero" on the Special Verdict form in the space for his percentage of fault.

If your answer to 1, 2, <u>and</u> 3 [is] "no," you may allocate fault to Louis Bunyan on the Special Verdict form.

---

**57** *Thompson v. Cooper*, 290 P.3d 393, 398 (Alaska 2012) (quoting *Kavorkian v. Tommy's Elbow Room, Inc.*, 694 P.2d 160, 166 (Alaska 1985)).

The City argued that "even if it was reasonably foreseeable that [Louis] would attempt suicide, fault [could] still be apportioned to [Louis]." The City proposed an alternative jury instruction that would have prohibited the jury from allocating fault to Louis only if he "was not capable of exercising reasonable care to prevent his suicide." It also proposed a special verdict question asking, "Was Louis Bunyan capable of exercising reasonable care to prevent his suicide?" The superior court overruled the City's objections and gave instruction 20 to the jury.

In *Joseph* we recognized that AS 09.17.080 "requires apportionment of damages in 'all actions involving fault of more than one person.' "[58] Specifically we recognized that in a custodial suicide action "a jury should be permitted to allocate the claimant's damages in the same way it usually does if multiple legal causes contribute to a loss."[59] But jury instruction 20 effectively foreclosed the possibility that the jury could both find the City liable and apportion some of the fault to Louis, thus constituting reversible error.

The intent of jury instruction 20 was to prevent the jury from attributing fault to Louis if it found that he lacked the requisite capacity to be held legally responsible for his actions. In *Wilson v. City of Kotzebue* we noted that "[t]he general rule is that voluntary intoxication does not relieve one from liability for the consequences of his intentional or negligent act, and one who becomes intoxicated is held to the same standard of conduct as if he were sober."[60] But we also held that incapacity is a defense

___

[58]  *Joseph*, 26 P.3d at 476 n.112 (quoting AS 09.17.080(a)). Because AS 09.17.080(a) explicitly requires apportionment of fault, we reject Judy's argument in favor of a per se rule against apportionment of fault in custodial suicide cases.

[59]  *Id.* at 476.

[60]  627 P.2d 623, 630-31 (Alaska 1981).

to comparative negligence "in the case of one who is so intoxicated, and whose mental and physical faculties are so impaired, that he is incapable of exercising due care for himself, where he is in the custody of another who is charged with the duty of caring for his safety."[61]  In *Kanayurak v. North Slope Borough* we reversed a trial court's grant of summary judgment, finding that a genuine issue of material fact existed with regard to incapacity where an inmate had a blood alcohol level of .264%, slurred speech that was difficult to comprehend, and difficulty standing without support.[62]

The facts in *Kanayurak* illustrate the high threshold for a finding of incapacity by virtue of intoxication in Alaska.  But instruction 20 does not apply this standard.  Instead, jury instruction 20 appears to be derived from an instruction quoted in a 1961 decision from a California intermediate appellate court,[63] which has never been approved in Alaska.  We reject jury instruction 20's incapacity standard because it was overbroad and effectively foreclosed the possibility of apportioning any liability to Louis.  The evidence that supported the jury's finding that Louis's suicide was

---

[61]  *Id.* at 631.  As amended in 1997, AS 09.17.080 requires apportionment of damages in "all actions involving fault of more than one person."  Although *Wilson*, decided in 1981, predates this transition to a comparative negligence regime, neither party disputes that incapacity may completely preclude allocation of fault in the voluntary intoxication context.  Therefore we assume *Wilson*'s applicability here.

[62]  *See* 677 P.2d 893, 897-99 (Alaska 1984).

[63]  *See DeMartini v. Alexander Sanitarium, Inc.*, 192 Cal. App. 2d 442, 448 (Cal. App. 1961) ("[I]f you find from the evidence in this case that at the time of the accident and immediately preceding it the Plaintiff . . . was in such mental condition that he was *likely to harm himself* or was *not capable of realizing the consequences of his acts* or of *caring for his own safety*, and that the defendant hospital, with knowledge of plaintiff's condition had undertaken to safeguard him and protect him against himself, then I instruct you that as a matter of law the Plaintiff . . . was not guilty of contributory negligence." (emphasis added)).

reasonably foreseeable also provided a basis for the first determinative factor in instruction 20, which foreclosed the apportionment of damages if "Louis Bunyan was likely to harm himself."

Because this error had the effect of precluding the possibility that fault could be allocated between Louis and the City, it was prejudicial.[64]  Although there is no need for a new trial on the issues of negligence and damages, the case must be remanded for trial proceedings that will allow the jury to decide the allocation of fault under a legally correct instruction.  On remand, the superior court's jury instruction should announce the proper *Wilson* incapacity standard and instruct the jury that it must allocate fault between Louis and the City unless it finds that Louis was so intoxicated and his mental and physical faculties so impaired that he was incapable of exercising due care for himself.[65]  The special verdict form should also reflect this standard, requiring a percentage allocation of fault between Louis and the City unless the jury finds that Louis's "mental and physical faculties [were] so impaired, that he [was] incapable of exercising due care for himself."[66]

## V.  CONCLUSION

We AFFIRM the superior court's rulings on the City's motions for summary judgment and directed verdict as well as its rulings regarding the appropriate duty of care and the admissibility of expert economic loss testimony.  But we VACATE the judgment and REMAND for further proceedings regarding Louis's capacity and the allocation of fault between Louis and the City of Hooper Bay.

---

[64]     *See Thompson v. Cooper*, 290 P.3d 393, 398-99 (Alaska 2012).

[65]     *See Wilson*, 627 P.2d at 631.

[66]     *Id.*